**COCHRAN et al. v. UNITED STATES, and three other cases.**

**Nos. 8673, 8674, 8678, 8691.**

Circuit Court of Appeals, Eighth Circuit.

May 5, 1930.

See, also, 34 F.(2d) 441.

T. D. Sheehan (John J. Keefe, of St. Paul, Minn., on the brief), for appellants Naegele, Rocheford, Tobias, Meyer, and Shiblin.

Arthur Schaub, of St. Paul, Minn., for appellant Kinderwater.

Charles N. Dohs, of St. Paul, Minn., for appellants Cochran and Ritter.

Einar Hoidale and Paul J. Thompson, both of Minneapolis, Minn. (John F. Dahl, of Los Angeles, Cal., and Thompson, Hessian & Fletcher, of Minneapolis, Minn., on the brief), for appellant Nelson.

Lafayette French, Jr., Sp. Asst. to Atty. Gen. (Lewis L. Drill, U. S. Atty., of St. Paul, Minn., on the brief), for the United States.

Before BOOTH and GARDNER, Circuit Judges, and OTIS, District Judge.

GARDNER, Circuit Judge.

Appellants, who are designated herein as defendants, were, with certain others, indicted on the 9th of November, 1927, in the District Court of the United States, for the District of Minnesota, for violations of sections 215 and 37 of the Criminal Code (18 USCA §§ 338 and 88), in an indictment containing twenty-three counts. They were charged with having devised a scheme to obtain money and property by false pretenses in connection with the sale of stocks, bonds, and notes of the Volkszeitung Printing & Publishing Company, the Hardstone Brick Company of Duluth, Inc., and the Hardstone Brick Company of Little Falls, Inc., and in carrying it out to have used the United States mails. The indictment occupies forty printed pages of the printed record. The twenty-third count charged a conspiracy of the same defendants under section 37 to violate section 215 of the Criminal Code (18 USCA §§ 88, 338), but prior to trial, on motion of the United States District Attorney, this conspiracy count was

withdrawn, and the indictment as to that count was, on order of the court, dismissed.

The sufficiency of the indictment was challenged by demurrers, which were overruled. The defendant Andrew E. Nelson made a motion for separate trial, which was denied; the defendant Alfred C. Pollman entered a plea of guilty; the court directed a verdict of not guilty as to the defendant Magnus Martinson; and the jury returned verdicts of not guilty as to certain other defendants, but returned verdicts of guilty as to one or more counts of the indictment as to the remaining defendants, who are appellants herein. Motions for new trial were made by the convicted defendants, which were overruled, and appeals were thereupon perfected to this court from the judgments of conviction. The appeals have been taken in some instances in groups and in others individually, and with each petition for appeal was filed assignments of error. Later there was filed in this court on behalf of all appellants, an instrument designated as an "Amended Additional and Supplemental Assignments of Error." This document assigns 135 alleged errors, and as printed occupies 127 pages of the record, while the separate assignments occupy many pages in addition thereto. In a brief of 493 pages, filed on behalf of all appellants, there is embodied assignments of error occupying 37 pages, while separate briefs filed contain ten pages of additional assignments. It will, of course, be impossible separately to consider all of these assignments of error. The words of Judge Rogers of the Second circuit, in Fitter et al. v. United States (C. C. A.) 258 F. 567, 569, seem peculiarly fitting in the instant case. It is there said: "He alone has sued out a writ of error, and there are 62 assignments of error, which occupy 12 printed pages of the record. We think this a good occasion to call attention of counsel to what the Supreme Court has said on several occasions in reference to the practice of burdening the record with dragnet assignments of error. In Phillips & Colby Construction Co. v. Seymour, 91 U. S. 646, 23 L. Ed. 341, the assignments of error were 10 less than the number found in this case, and the court said: 'The object of the rule requiring an assignment of errors is to enable the court and opposing counsel to see on what points the plaintiff's counsel intend to ask a reversal of the judgment, and to limit the discussion to those points. This practice of unlimited assignments is a perversion of the rule, defeating all its purposes, bewildering the counsel of the other side, and leaving the court to gather from a brief,

often as prolix as the assignments of error, which of the latter are really relied on. We can only try to respond to such points made by counsel as seem to be material to the judgment which we must render.' In Central Vermont Ry. Co. v. White, 238 U. S. 507, 35 S. Ct. 865, 59 L. Ed. 1433, Ann. Cas. 1916B, 252, the court recurred to the subject again, quoting from the earlier case which we have cited. The practice condemned is not conducive to the better administration of the law, and embarrasses, rather than promotes, the cause of justice."

■■ 1. The indictment, so far as it relates to a fraudulent scheme to obtain money by false pretenses, omitting formal parts, charged that the defendants "did devise a scheme and artifice for obtaining money and property by means of false and fraudulent pretenses, representations and promises, from a class of persons, some one of whom is named in each of the counts of this indictment from and including the twenty-second count thereof, as the addressee of a letter pertaining to said scheme and artifice, but which class was and is so numerous that all the persons composing it cannot as a practical matter be named herein, while at the same time said class may be and is described as being composed of persons mostly of German descent, then residing in said district and division and in other parts of the State of Minnesota, as well as in other states, mostly those adjacent or near to said State of Minnesota, who were respectively desirous of investing their money in shares of stock, in bonds and in promissory notes which had and would have value because of the good financial standing, prospects and ability of the business concerns issuing and putting such securities forth and because of the good earning capacity of such concerns and their ability and intention to pay from the earnings of said concerns dividends and interest upon said securities to the holders thereof, which said scheme and artifice is here described as being one for obtaining the money and property of said persons by solicitation of such persons, directly and through agents, and by means of divers newspaper advertisements, and divers letters, and inducing such persons by such means to open correspondence with said defendants through the postoffice establishment of the United States, and to send and pay their money and property respectively to said defendants, under the corporate names of the Volkszeitung Printing and Publishing Company, Hardstone Brick Company of Duluth, Incorporated, and Hardstone Brick Company of Little Falls, Incor-

porated, for purchasing and securing the capital stocks, bonds and promissory notes of those corporations for investment, and by making pretenses, representations and promises in connection with such solicitation and correspondence to the effect that such stocks, bonds and notes were and would be respectively good and safe investments because of the financial worth of said corporations respectively, because of their good management, business ability and prospects, and because of the ability and intention of said corporations respectively to pay dividends and interest to such investors; all of which said money and property said defendants, according to said scheme and artifice, upon so obtaining the same, would convert to their own use and benefit, and not to any use or benefit of any of said persons so sending and paying the same to them, the said defendants; and which said pretenses, representations and promises, when so made to said persons, as said defendants and each of them then well knew, would be false and fraudulent in this, that none of said corporations had property, credit or business, or prospective business, warranting their issuing or putting forth such securities; in this, that neither said corporations nor said defendants were or would be able to, or intend to, or would, pay any bona fide dividends or interest, to any of such persons so investing their money, or any dividends or interest from earnings of said corporations, on account of such investments or any of them; and in this, that, for these reasons, said stocks, bonds and notes would be practically worthless; whereby each of said persons so sending and paying their money and property to said defendants as aforesaid would, according to said scheme and artifice, lose and be defrauded of the same." The indictment then proceeds to allege that the defendants, for the purpose of executing the scheme, unlawfully and feloniously placed in the post office of the United States, to be sent and delivered by the Post Office Department of the United States, twenty-two certain letters set out in separate counts of the indictment. In all the subsequent counts, that portion of the first count, which describes the scheme and artifice, is incorporated by reference. It is claimed that the indictment does not set out with sufficient particularity the scheme and artifice which it is alleged defendants had devised, to advise them of the nature of the accusation against them. The use of the post office establishment in the execution of the alleged scheme to obtain money by false pretenses is the gist of the offense which the statute denounces, and not the scheme to defraud. Brady v. United States (C. C. A.) 24 F.(2d) 405, 59 A. L. R. 563; Barnard v. United States (C. C. A.) 16 F.(2d) 451. While the scheme or artifice must be sufficiently set forth so as to advise the defendants with the particulars thereof, yet the scheme need not be set forth with that particularity which would be required if the scheme was the gist of the offense. Gould v. United States (C. C. A.) 209 F. 730; Brooks v. United States (C. C. A.) 146 F. 223; Colburn v. United States (C. C. A.) 223 F. 590; McClendon v. United States (C. C. A.) 229 F. 523; Gardner v. United States (C. C. A.) 230 F. 575; Whitehead v. United States (C. C. A.) 245 F. 385; Wilson v. United States (C. C. A.) 275 F. 307; Grossman v. United States (C. C. A.) 282 F. 790; Chew v. United States (C. C. A.) 9 F.(2d) 348; Freeman v. United States (C. C. A.) 244 F. 1. This indictment charges the offense substantially in the language of the statute; the unlawful scheme, fraud, and artifice is then specifically set forth; the falseness and untruthfulness of the representations used to sell the stock and securities is negatived, and we are clearly of the opinion that the scheme and artifice is set out with sufficient particularity.

It is particularly urged in behalf of the defendant Nelson that the indictment did not sufficiently advise him as to the nature of the offense charged. He was in fact charged as a principal, which was permissible, even though he were in fact an aider and abetter. Greenberg v. United States (C. C. A.) 297 F. 45, 48; Collins v. United States (C. C. A.) 20 F.(2d) 574, 578; section 332 Criminal Code (18 USCA § 550). As said by this court in Greenberg v. United States, supra, "by the common law one who was present, aiding and abetting the commission of a felony, was deemed an accessory at the fact, or principal in the second degree, and generally when the punishment was the same such principal could be indicated, at the option of the pleader, either as a principal in the first degree, by direct allegation that he committed the felony, or according to the fact, by alleging that he aided and abetted the commission of the felony. Bish. New Cr. Proc. (2d Ed.) vol. 2, §§ 332 (5), 334; volume 3, § 3, (2); Commonwealth v. Chapman, 11 Cush. (Mass.) 422, 428; Reg. v. Tracy, 6 Mod. 30, 32; 1 Whart. Cr. Law (11th Ed.) § 259. Under section 332 of the Criminal Code (section 10506, Comp. Stats. [18 USCA § 550]), providing that whoever aids, abets, counsels, commands, induces, or procures the commission of an act constituting an offense defined

in any law of the United States is a principal, an accessory either at or before the fact, may, at the pleader's option, also be charged directly with the commission of the crime, and such an indictment is supported by evidence that the defendant aided and abetted its commission." Being charged with a knowledge of the law, Nelson is conclusively presumed to have known when he read this indictment, that it was not necessary in order to bring him within the indictment, that he should in the first instance have participated in the formation of the scheme to defraud. If, as suggested by counsel, his thought on reading the indictment must have been that "there must be some mistake here," he was bound not to stop with this meditation, but to have known that he might still be guilty if he aided and abetted in the execution of the scheme after it had been formed by others. With this knowledge which the law implies he had, had he desired further information or details, he could have secured them by demanding a bill of particulars. Rinker v. United States (C. C. A.) 151 F. 755, 759; Rimmerman v. United States (C. C. A.) 186 F. 307; Chew v. United States (C. C. A.) 9 F.(2d) 348, at page 353; Rosen v. United States, 161 U. S. 29, 16 S. Ct. 434, 480, 40 L. Ed. 606. In Rinker v. United States, supra, in an opinion by Judge Van Devanter, it is said: "When an indictment sets forth the facts constituting the essential elements of the offense with such certainty that it cannot be pronounced ill upon motion to quash or demurrer, and yet is couched in such language that the accused is liable to be surprised by the production of evidence for which he is unprepared, he should, in advance of the trial, apply for a bill of the particulars; otherwise it may properly be assumed as against him that he is fully informed of the precise case which he must meet upon the trial." Adding to the knowledge which Nelson is conclusively presumed to have had, that which he might readily have procured had he demanded a bill of particulars, it is clear that the indictment was sufficient to apprise him of the nature of the charge against him.

It should be observed in this connection, as will presently appear, that Nelson in fact knew of the government's contention with reference to his connection with the transactions involved. This is disclosed by his application for a separate trial. The record affirmatively shows that he was not in a benighted state of mind on these matters and could not have been prejudiced.

2. In sequence of time, the next proceeding complained of is the denial of the motion of the defendant Nelson for a separate trial. This motion was based upon a showing to the effect that Nelson took but a limited part in the scheme and transaction set out in the indictment, and that if he were granted a separate trial, a large part of the evidence would be excluded as to him. The motion was supported by an affidavit of one of his attorneys, the material allegations of which are as follows: "That while the indictments now pending in said court against said Nelson, charge that he, with said other defendants, were guilty of conspiracy and mailed, or caused to be mailed, the letters in the indictments set out, affiant is informed and believes that it is not claimed by the Government that Nelson's participation was any broader or greater than the particular acts set out and alleged in the indictment in case No. 2865, and affiant, in appealing to the discretion of the court in this matter, states and alleges upon information and belief that the Government makes no claim of any participation by said Nelson in said alleged conspiracy, other than the act specifically referred to in said indictment in case No. 2865, and in connection with which the name of Nelson is specifically mentioned in said indictment. That this affidavit is made for the purpose of incorporating said indictment in case No. 2865, by reference, for use on the attached motion, and for the purpose of setting out facts that may appeal to the court as grounds for granting the defendant Nelson a separate trial."

This presented but little to appeal to the discretion of the court. As has already been observed in this opinion, Nelson was properly charged as a principal, and as said by this court in Collins v. United States, supra, "It has also been held that an indictment may charge defendant with being a principal in the commission of an offense, and conviction will follow if the evidence sufficiently shows that he was merely an aider and abettor." A motion for severance is addressed to the sound discretion of the trial court, and that discretion when exercised will not be disturbed, except in a clear case of abuse thereof. Burns v. United States (C. C. A.) 279 F. 982; Belden v. United States (C. C. A.) 223 F. 726; Schwartzberg v. United States (C. C. A.) 241 F. 348; Ader v. United States (C. C. A.) 284 F. 13; Lennon v. United States (C. C. A.) 20 F.(2d) 490; Buchanan v. United States (C. C. A.) 15 F.(2d) 496.

While there was doubtless considerable evidence received on the trial of the case that was not admissible so far as the defendant.

Nelson was concerned, yet an examination of the record convinces that his rights were carefully guarded by the court, both at the time of the reception of such evidence and in the court's instructions to the jury. The ruling of the court must be viewed in the light of what was made to appear to the court at the time the motion was made, and not as it may have appeared at a later stage of the trial. The motion was not renewed at any time, and it cannot be said that the court abused its discretion in denying it when made.

■ 3. After the trial of this cause, government's Exhibit No. 40 was lost. It constituted one of the ledgers of the Volkszeitung Company. It was received in evidence. The nature and substantial parts of its contents are shown by the oral testimony. This exhibit contained accounts of the defendant Cochran and some of the other defendants with the Volkszeitung Company. The books of the Volkszeitung Company, including Exhibit 40, were audited, and the accountant making the audit was a witness at the trial at a time when the defendants and their counsel had access to Exhibit 40. He testified that about May, 1927, Cochran had received from the Volkszeitung Company, or its subsidiaries, approximately $158,000, and that he was indebted to that company in the sum of approximately $69,000. It is now claimed that by a proper audit of the books, including Exhibit 40, this testimony might be shown to be incorrect, and it is claimed that Cochran was not indebted to the Volkszeitung Company in excess of about $7,000. The exhibit, it is observed, was not a part of the testimony offered by the defendants. The parts of the exhibit deemed to be material were testified to by the accountant, and the book was available not only during the trial of the case for use of counsel in cross-examination of the account, but for several months after the trial. The ledger is, of course, not a book of original entry and as the books of original entry were all in evidence, this ledger could have been reconstructed, had that been desirable. At most, it could only show the profit or loss of Cochran in connection with his Volkszeitung dealings. This is wholly immaterial. Whether or not a scheme to obtain money by means of false and fraudulent representation is a financial success is not the test of criminal liability. The question, after all, is not whether or not Cochran or any of the defendants made money out of the scheme, but whether they formed a scheme to defraud,

and in its execution used the United States mails. Byron v. United States (C. C. A.) 273 F. 769; Linn v. United States (C. C. A.) 234 F. 543; Grant v. United States (C. C. A.) 268 F. 443; Foster v. United States (C. C. A.) 178 F. 165; Calnay v. United States (C. C. A.) 1 F.(2d) 926; Kellogg v. United States (C. C. A.) 126 F. 323; Wine v. United States (C. C. A.) 260 F. 911; Barnes v. United States (C. C. A.) 25 F.(2d) 61. Nor is it important to determine what was the condition of the account between Cochran and the Volkszeitung Company. It seems clear that such portions of this exhibit as have any materiality are contained in the record, and that the case should not be reversed simply because it has been discovered that this exhibit cannot now be produced.

■ 4. Motion for a directed verdict at the close of all the testimony was interposed on behalf of each of the defendants. The motion was granted as to the defendant Magnus Martinson and denied as to all others. The denial of these motions is urged as error, and this presents the question of the sufficiency of the evidence to sustain the judgment as to each of the defendants. In considering this question, it must be borne in mind that the indictment charges the formation of a scheme to obtain money by false representations, and while the conspiracy count was dismissed, yet when such a scheme as is charged in this indictment is criminally participated in by more than one individual, it constitutes in and of itself a conspiracy. Chambers v. United States (C. C. A.) 237 F. 513, 524; Van Riper v. United States (C. C. A.) 13 F.(2d) 961; Robinson v. United States (C. C. A.) 33 F.(2d) 238, 240; United States v. Herzig (D. C.) 26 F.(2d) 487. As said by the late Judge Sanborn in Chambers v. United States, supra, in considering the sufficiency of the evidence in a case of this character, "There was, however, no evidence that he mailed, or had knowledge of the preparation or mailing, or directed the mailing of, any of the letters set forth in any of these counts, and it is insisted that his conviction and sentence on these counts is without support in the evidence. Where two or more persons jointly devise and execute a scheme to defraud by the use of the mails, they may thereby become in effect partners in the criminal purpose of so using the mails to defraud. If they do, the acts of each thereafter, during the existence and execution of the scheme, done in furtherance of that execution, may become the acts of all the partners, and each may be convicted of

the mailing of a letter which one of his partners caused to be mailed in the execution of the scheme." In Robinson v. United States, supra, the court states the rule as follows: "Furthermore, a scheme to defraud, when shared in by several, becomes a conspiracy, and, if a conspiracy exists in fact, the rules of evidence are the same as where a conspiracy is charged."

The defendants fall into three different classes: (1) Those who, it is claimed, originally devised the scheme; (2) the salesmen who, it is claimed, with knowledge of the scheme, made misrepresentations in the sale of the stocks, bonds, and notes; and (3) the defendant Nelson who it is claimed, with knowledge of the fraudulent scheme and device, aided and abetted the project by granting licenses to the salesmen and licensed and registered for sale the stocks and securities.

Substantial evidence convinces that the defendant Cochran and one Arthur Lorenz devised the fraudulent scheme to obtain money by false pretenses, as set out and described in the indictment. They secured control of the Volkszeitung Printing & Publishing Company, publishing in German a daily newspaper and a weekly newspaper, with subscription lists of some 30,000 German subscribers. This newspaper plant was taken over for the purpose of enabling these promoters to capitalize its character as a German instrument of standing and influence among thrifty German-speaking people of the Northwest. Many of its subscribers had taken these German publications for many years and had known personally or by reputation, its former editor and proprietor, Mr. Bergmeier, upon whose death his widow, Mrs. Bergmeier, assumed control of the publications. Her name was not only retained but made prominent, because of the connection of her husband and herself with the publication of these papers. The name of Cochran, not appearing to be of German origin, was suppressed, while these German subscribers were solicited through German salesmen and their sentiment and prejudices were appealed to. Aside from this background there was no substantial financial basis for the projects promoted and the acquisition of other properties and the organization of other corporations were all clearly for the purpose of advancing a stock-selling scheme with no real intention of making them successful business enterprises. The entire activities of the defendants were directed to the sale of stocks and securities, and not to the establishment or building up or development of any of the business projects whose stocks and securities were being marketed. The methods employed tend to prove the formation of the scheme to obtain money by false pretenses. The defendant Pollman, in his testimony, discloses something of the intent and purpose of the scheme. Cochran was apparently commander-in-charge of the sales force and they received instructions from him. Pollman, in referring to this matter says: "One of his (Cochran's) expressions was to appeal to the readers' sentiment, to approach them in this way: To refer them to the Liberty Bonds that they were forced to buy and refer to them as blood money that was used to fight only their own people in Germany, and it was their duty as good patriotic Germans in this country to bring back the condition of their people to where it was before the war, and another one of his expressions was, 'Use a lot of sob stuff. The more sob stuff you use, the quicker you will bring out their money.' Another favorite expression was, 'Get some money. I don't care how you get it, but get it. We will take care of the squawk.' I asked him one time whether we would use his name. He said, 'No, you use the names of Lorenz and Mrs. Bergmeier. Also tell them the hardship the Bergmeiers had gone through during the war, how they suffered and how they kept the paper in circulation and printed it every day.' He said to tell generally the success of the paper, how old it was, and that it had never lost any money for any of its customers for a period of over fifty years. He told us to say that the security of this investment was as safe as any in the Northwest—as safe as it could be. He says, 'Bring in as much Northern States Power as you can get.'"

The German-speaking salesmen, advertisements, circulars and letters printed in the German language were the instrumentalities through which the false representations were made and conveyed. These representations were of a great variety; that the Volkszeitung Company was sound and safe; that it had bought a St. Louis newspaper and was about to take over the Lincoln Free Press; that it had $60,000 in reserve; that it was making 30% on the money it was borrowing; that it could "get plenty of money from the banks but don't want their money;" that the salesmen were just going around to the Germans who took the Volkszeitung to give them a chance to make some money on good security; that the securities were a good investment; that the purchasers of the securi-

ties could get their money back at any time with 7 per cent. interest; that the money was to be used for building a foundry for making type and machinery; that the government limited the gold notes that could be sold and that the government appraised the property; that "the bank was stealing people's money, but with them, our money was sure."

While these and other like extravagant representations were being made by the salesmen, there were being sent through the mails to the subscribers, circulars commending the purchase of these securities. These circulars were all in the German language. The following are typical: "How much interest does your money bring? Have you invested it safely so that you are protected against all loss? You have worked all these long years and saved half of your life in order to have saved for your old age. You must now assure yourself that your savings cannot be lost through the closing of a bank or a business crisis, and you also owe it to yourself to have your money earn as high interest as is commensurate with first-class security. The Volkszeitung, existing for over forty years, is one of the most flourishing enterprises in the entire state. More than 200,000 copies of our paper leave our large presses every week. In addition to our known place of business, we have acquired during the past few years, the Piedmont Hotel and the Alexandria Apartment. The valuation of the Piedmont is estimated at $375,000 and the Alexandria at $308,000. * * * Please do not let this opportunity pass by, but invest your money in first-class security and at a high rate of interest. Your own interests should cause you to invest your money where it is insured against loss, and where you don't have to be satisfied with 3 or 4%. Absolutely safe—7%."

In another similar circular it is said: "As we have been in business over fifty years and enjoy the best reputation of the entire state, it is self-evident that we are careful to recommend to our readers only such investments which exclude all loss. This is particularly true of our gold notes, which are insured through valuable real estate in the best parts of St. Paul. Recently we sent you some printed matter, describing the real estate and the business enterprises which are controlled by the Volkszeitung and which are turning in such good returns that it is possible for us to give our readers 7% interest, which is a high rate of interest under present conditions. Absolute safety and good inter-

est will also be our business principle in the future in our intercourse with those of our readers who have invested money with us."

In still another, appears the following: "You and your wife may depend upon it that we will not recommend an investment to you through which our German readers would lose their money. Everyone of our readers is in a similar position, having saved a few thousand dollars through a lifetime of hard work, and we do not wish to burden our German conscience and be responsible for the loss of the few cents they have saved up for their old age."

As a part of the campaign to place the stock of the Hardstone Brick & Engineering Company, the following, among other letters, was sent through the mails: "Dear Friend and Reader: The German spirit of invention brings to shame all calumny directed against the Germans during the days of the war. One of the most brilliant German inventions which has come to us across the ocean is the new hard brick made of sand and lime. * * * The American architects are very much enthused over the German hard brick and are ordering it by the millions wherever factories are being erected for its manufacture. For the erection of such factories the Volkszeitung has organized a special company, the Hardstone Brick & Engineering Company and at the present time factories are being erected at Little Falls, Minnesota, Duluth, Minnesota, Appleton, Minnesota and LaCrosse, Wisconsin and St. Louis, Missouri. In all places the German-Americans are proud of this invention and are evidencing an intense interest to support it. In St. Paul the factory has been completed and is operating with splendid success. The Volkszeitung wishes to give its readers and friends an opportunity to become share holders in this factory. * * * If you wish to become a share holder in this brilliant invention, you must send the inclosed coupon with your signature to the Editor-in-Chief, Mr. Arthur Lorenz. Do not delay as we can keep our lists open only a few weeks longer and the interest shown in German-American circles is very great. We will gladly accept your present Volkszeitung securities at full value in exchange for securities in the new Hardstone Brick Factory. These securities, for the sale of which we have received a license from the State Securities Commission of the State of Minnesota, bear interest at 7% but our friends have every prospect of receiving greater dividends at the end of the year."

The falsity of many of the representations made is abundantly established. With one exception, hereafter to be noted, these and similar representations were made by the defendant salesmen, and the evidence warrants the conclusion that they knew of the falsity of the representations and of the fraudulent purposes with which they were made. The expense involved and the compensation paid to the solicitors were so extravagant as to arouse suspicion of any one connected with the promotion of these enterprises.

The connection of the defendant Nelson with the fraudulent scheme to obtain money by false pretenses is on an entirely different basis from that of the other defendants. He was a public officer of the state of Minnesota, vested with the authority of granting permits for the sale of corporate stocks, bonds, and securities. He confessedly had nothing to do with the original formation of the scheme and device, nor was he in any way connected with the earlier stages of the promotion of this scheme. He came into the activities at a later time, when it was necessary to secure license to sell stock of the Hardstone Brick Company of Duluth, Inc., and the Hardstone Brick Company of Little Falls, Inc. These companies were apparently organized for the purpose of relieving the Volkszeitung Company from the necessity of liquidating the gold notes which were payable in eighteen months from the date of their issuance, having been so made payable to enable the promoters to sell them without the necessity of securing permit or license from the state authorities. To relieve this situation, it was proposed to exchange the stock of these brick companies for the outstanding gold notes and also make further sales of such stock. This necessitated the securing of authorization from the division of securities of the state of Minnesota, Nelson then being securities commissioner. Cochran was acquainted with Nelson before his appointment as securities commissioner. A government witness testified that, "He (Cochran) said that Nelson very likely would be appointed Securities Commissioner. That if he was, there would be no trouble in selling notes or bonds." In connection with the application for licenses to sell these stocks, Nelson learned from the employees of his office with reference to Cochran's exploits. Mr. Brubaker, connected with Mr. Nelson's department, conferred with Nelson while the applications for license to sell were pending, and told him that the men who were making applications for licenses were members of the Cochran sales force; that he believed Cochran was back of the organization and was trying to sell stock for the Hardstone Brick & Engineering Company; that Cochran had been indicted in Ramsey county; that he had been indicted in federal court in connection with receiving stolen bonds; that he had been indicted in Hennepin county for violation of the Securities Act; that he and the officers of the Loring Holding Company had been convicted at Stillwater upon a charge of violating the Securities Act; that those who had purchased bonds of the Loring Holding Company and exchanged their bonds for stock of a company which was promoted by Cochran, had lost all the money they put in the company; that the stock-selling campaign carried on by this organization was one of the dirtiest stock selling campaigns that had come under his notice while he had been with the commission and that the commission had received many complaints against the salesmen who were working for Cochran. That Cochran had acquired the Volkszeitung Printing & Publishing Company and had sold stock or had sold bonds and notes of that corporation, and that those securities were fraudulent and that the people would lose their money, and that this same sales force, or largely this same sales force, had worked for Cochran during that sales campaign. In his testimony he further says: "I got the investigation application file that I had with reference to the Loring Holding Company and showed or submitted to him the statement which Deringer had given to Mr. Grindeland, and which was in the files of the commission, in regard to Cochran's operations. Government's Exhibit 316 is the Deringer report I showed to Mr. Nelson. I wish to state that I do not recall whether I handed the paper to him or read it to him." It should be stated in this connection that Deringer was one of the defendants on trial. The statement referred to contains, among other things, the following:

"The Volkszeitung had been operated for years by C. H. Bergmeier, who died about eight years ago, leaving the paper to his widow, who thereupon assumed charge of its financial management. Its affairs did not prosper under her care, and in the Spring of 1923 it was incumbered with a mortgage of $25,000 to Otto Brener of St. Paul, in addition to which Mrs. Bergmeier owed Brener some $18,000 personally. That paper also had sundry other obligations.

About this time Mrs. Bergmeier offered to sell the three story stone building at Third and Jackson streets, St. Paul, the entire equipment, subscription list of some 16,000 subscribers and good will for $100,000, the entire plant showing an annual net revenue of approximately $4,000. This offer was made to a group of Germans in Minneapolis, among whom were Otto Zimmerman, John F. Bernhagen, August Miller, one Tetzlaff, Dr. E. E. Eitel and Paul F. Dehnel, the printer. Dehnel had this offer in writing, showing value of the entire property, subscribers and net earnings. On investigation and consideration, the offer was declined, principally because the price was considered excessive. Mrs. Bergmeier made the same offer to the Steuben Society of New York, represented by Mr. Schneider, which was also rejected on account of excessive price. Faced by the necessity of additional financing, Mrs. Bergmeier employed one Alferman of St. Paul to sell Volkszeitung stock to the public. License was secured from the Securities Commission and Alferman commenced work just prior to Lorenz's imprisonment. Lorenz gave Cochran and Ritter this information, and Cochran and Ritter, with Lorenz, thereupon evolved a plan to work into the deal between Alferman and Mrs. Bergmeier, seeing the possibilities of stock sales to the subscription list of the Volkszeitung and the influence that German sentiment would bring to bear on such sales. Cochran and Ritter thereupon approached Mrs. Bergmeier with Lorenz, and within a week or so talked her into dismissing Alferman and entering into a new contract with Cochran and Ritter, Lorenz becoming chief understudy of Cochran and Ritter and employed by them. Alferman received $5,000 from Mrs. Bergmeier for cancelling this contract. Cochran thereupon obtained the stars of the sales force that had put over the Franklin Co-operative Creamery Association and the Daily Star of Minneapolis and started their sales campaign, using Volkszeitung space for display advertising of the stock. The Securities Commission being advised of the new deal and the association of Cochran and Ritter, as well as of the methods employed, objected, with the result that the license was cancelled. It is presumed that Cochran thereupon evolved a new plan for the sale of the Volkszeitung securities, which in its development offered an even greater opportunity for quick money in greater amounts—the plan being to evade the authority of the Securities Commission on the guise of complying with the Minnesota law, allowing the sale of bonds up to 70% of the apparent value of the property. To this end, Cochran secured an appraisement in line with his deeds and purporting to be from Lloyd's of Chicago, of $525,000 on the building, plant, equipment, subscription list and good will of the Volkszeitung Printing and Publishing Company. Upon attaining such an appraisal, Cochran had the Volkszeitung authorize the issue of $275,000 in twenty year gold bonds of several denominations at 7%, and thereupon recommenced his financing with his sales force, without regard to the Securities Commission. Sales were eminently successful from a money standpoint, but the methods employed are hardly to be recommended. German sentiment was worn to the bone. Liberty Bonds (blood money) were reluctantly accepted to relieve their owners of the stigma of their possession and bonds and stocks of various companies of poor standing, such as the Northern States Power, were taken to save their owners from undoubted loss.

"As a philanthropist, Cochran and Ritter appeared to have been overlooked by some of our prominent biographers—Irving Cobb, for instance.

"Germans who were strongly in favor of the continuance and enlargement of the Volkszeitung influence rallied to its support, one William Schlichau of Loganville, Wisconsin, going so far as to send $14,300 as an appetizer in the morning mail, whereupon Cochran and Lorenz boarded the next train for Loganville to ascertain whether Schlichau had not forgotten the current month's creamery check. Fortunately, he had included same and received a blessing of the triumvirate.

"Digression aside, representations were freely made that the Volkszeitung needed brand new equipment, that the building needed alterations, that an English newspaper under Volkszeitung supervision was to be installed in January, 1924, that the Volkszeitung itself was to carry an increasing amount of English printed news, that the plant was earning several times the interest charges, that the bonds could be cashed in at any time (this latter statement being in writing in some instances), and prospects were taken through the building and particular care was had in showing the equipment of the Riverside Press (a separate concern which has since left the Volkszeitung building). What was not told the bond buyers was the deal whereby Mrs. Bergmeier was to get approxi-

mately $200,000 from the bond money and transferring her entire interest in the Volkszeitung to Messrs. Cochran and Ritter, they in turn making a small distribution to some of the old employees and editors."

With this information, it can scarcely be said that Nelson did not have knowledge of the nature of the activities of Mr. Cochran and his organization. While these applications were pending, Nelson entered into negotions with Cochran for the sale of the Stats Tidning, a Swedish newspaper, and sold it at an exorbitant price. At the same time, Nelson solicited Cochran to purchase certain diamonds which he had on hand and which he very much desired to dispose of. The jury may well have believed from the evidence that in these transactions Nelson accepted a bribe of a large sum of money, the record indicating $50,000, and pursuant thereto issued, or secured to be issued, the licenses to sell stock and securities, all of which was a part of the scheme theretofore conceived and devised to obtain money by means of false and fraudulent representations. Thereafter, further false and fraudulent representations were made, and while Nelson was still connected with the negotiations the mails were used. From the nature of the scheme to obtain money by false pretenses, as it was disclosed to Nelson, it was apparent that in the ordinary course of these transactions which he was aiding and abetting the mails would be used. Clearly, the use of the mails was in contemplation of the parties, and the jury may well have determined, under the evidence, that Nelson knowingly and intentionally entered into the scheme which Cochran and his associates had devised.

In this connection, it is to be observed that the court instructed the jury as follows: "Any defendant who knew that the enterprise was one for obtaining money or property by false and fraudulent pretenses, representations or promises, and who aided in any substantial way in the execution of it—that is, helped in any way to carry it out—is guilty if the letters set out in the indictment, or some of them, were mailed in furtherance of it by one of his associates in the unlawful scheme. So, you must ask yourselves this question as to each defendant: Did he become a participant in this scheme? Did he aid in devising it or in its execution, knowing its character?" No exception was taken to this instruction by any of the defendants.

Specifically referring to Nelson, the court instructed the jury that, "if other facts and circumstances proved by other evidence in the case create in your mind a lasting conviction that Mr. Nelson had become, at the time those letters were written, unlawfully associated with Mr. Cochran and an aider and abetter of Mr. Cochran in the unlawful scheme alleged, then you would have a right to consider such letters insofar as they tend to throw any light upon the character of his association with him, provided the letters were written in connection with the scheme alleged by the government, in reference to the common object, and formed a part of the scheme."

The court further instructed the jury with reference to the defendant Nelson: "In connection with the case of the defendant Nelson, you will keep in mind that he is not being tried here for bribery, or misconduct or negligence as an officer of the state. Before you can convict him, you must find beyond a reasonable doubt not only that the scheme was as alleged by the Government, but that the part he took in granting registration of the stock of the Little Falls and Duluth Companies, or either of them, or the part he may have taken in granting agents' licenses to any of the defendants, was intentionally taken by him for the purpose of aiding and assisting some or all of the defendants in carrying out or furthering the scheme charged, and that he then knew that the scheme was such a scheme at that time. It is immaterial whether Nelson used good judgment or not in whatever action he took with reference to the registration of these companies or granting the agents' licenses, if he acted in good faith. It must appear beyond a reasonable doubt that he knowingly acted with reference to these matters for the purpose of aiding and assisting the defendants in carrying out the scheme set out in the indictment before he can be convicted. On the question of knowledge of the defendant Nelson, you will recall that the Government's claim is that he had been advised by the employees of the Division of Securities as to what it is claimed the character of the scheme was, and that he had been shown the Deringer letter. Mr. Nelson, in his own behalf, has testified that he did not know anything about the alleged character of the scheme and had no information as to anything wrong with it. It is for you to determine from all the evidence whether Mr. Nelson knowingly and intentionally aided and abetted in the furtherance of this scheme, and thereby became associated in it. If you find that he did, and that the mails were used as claimed, then he would be guilty of the charges contained in the counts of the indict-

ment which refer to letters mailed in furtherance of the scheme during the period that the evidence shows he was knowingly associated in it. He, of course, cannot be guilty of the mailing of letters at times when he could have had no connection with the scheme."

 These quoted portions of the instructions were not excepted to, and, in determining the sufficiency of the evidence to sustain the verdict as to Nelson, they must be accepted as the law. We are of the view that there is substantial evidence from which, under these instructions, the jury might properly have found, as they did, the defendants guilty beyond a reasonable doubt, and their verdict should not be disturbed by this court, unless the evidence as to mailing the indictment letters was insufficient. In considering this contention it should be noted: (1) That in the various motions for directed verdicts, although the grounds upon which they are based are set out with particularity, no suggestion is made that the evidence of mailing was insufficient. (2) The court, in its instructions, in referring to the mailing of the indictment letters, said: "The questions of the mailing of the letters and whether they were sent in execution of the scheme, are questions of fact for you to determine, uninfluenced by any opinion of mine, but I think I may fairly state that there appears to be no serious contention that these letters were not mailed at or about the time they purport to have been mailed in connection with the business of the enterprises referred to in them and for the purpose of carrying on that business." This instruction was not excepted to, and it is quite apparent that the claim now made to the effect that the evidence of mailing is insufficient, is an afterthought. (3) These letters were all written on the letterhead of the Volkszeitung Printing & Publishing Company or the Hardstone Brick Company of Duluth, the concerns involved in the scheme. They were written by the employees in the office, some of them signed personally by certain of the defendants, others signed with the rubber stamp of certain of the defendants, but all written under the direction of those in charge of that part of the stock and bond selling campaign. They were then inclosed in envelopes, sealed, addressed, and the postage prepaid. It is clear that they were prepared for the purpose of being mailed. The proof shows that they were received by the addressees from the post office in envelopes bearing postmarks showing that they in fact had been mailed. It appears from the record that there was a vast organization through which this correspondence was carried on, and it was the universal custom and practice that the correspondence, including the letters, were actually mailed by the office stenographer or stenographers, and this was done under specific directions from certain of the defendants, among others the defendant Arthur Lorenz. The proof of mailing is all the proof that can be said to have existed. As noted, the letters were prepared for mailing; they were so prepared in the office of the organization; it was the custom of that organization to mail the letters through a stenographer; the letters were received by the addressees in envelopes, showing that they in fact were mailed. This was sufficient proof of the mailing, from which the jury might properly find that these letters had in fact been sent and delivered by the Post Office Department of the United States. When offered in evidence they were not objected to on the ground that there was not sufficient proof that they had been mailed. Stokes v. United States, 157 U. S. 187, 15 S. Ct. 617, 39 L. Ed. 667; Brooks v. United States (C. C. A.) 146 F. 223; Horn v. United States (C. C. A.) 182 F. 721; Levinson v. United States (C. C. A.) 5 F. (2d) 567; Krotkiewicz v. United States (C. C. A.) 19 F.(2d) 421; Lewy v. United States (C. C. A.) 29 F.(2d) 462, 62 A. L. R. 388; United States v. McCann (C. C. A.) 32 F. (2d) 540; Farmer v. United States (C. C. A.) 223 F. 903; Baker v. United States (C. C. A.) 10 F.(2d) 60.

 Counsel for defendants refer to the cases of Brady v. United States (C. C. A.) 24 F.(2d) 399 and Freeman v. United States (C. C. A.) 20 F.(2d) 748, but proof as to the mailing of the letters in the instant case is much stronger than the proof presented in either the Freeman or Brady Cases. The mailing of a letter, like the proof of any other fact, may be proven by circumstantial evidence, and the circumstances here prove beyond all reasonable doubt that these letters were mailed pursuant to authorization of those in charge of this campaign. It follows that the evidence was sufficient to sustain the verdicts of guilty as to all these defendants, with one exception which will now be noted.

 The defendant Richard O. Naegele was employed by Cochran as a salesman. He also acted nominally as a president of one of the companies. A search of the record fails to show that he made any misrepresentations to any purchaser, and the only thing that tends to connect him with any such misrepresentations or fraud is the testimony of one witness to the effect that he was present when the defendant Heitlinger made false

statements and misrepresentations. This is denied by both Naegele and Heitlinger. Counsel for the government, in their brief, referring to Naegele, say: "The salesman Naegele was also an officer of one of these Brick Companies. In fairness to this defendant, we desire to state that no misrepresentations were attributed to him by any investor witness, although he was present when such statements were made by other salesmen. His testimony, while on the stand relating to his connection with one of the Brick Companies, was given so frankly and with such an air of truth as to prejudice the Government in his favor. The jury could have acquitted him without being inconsistent with the record." The meagerness of the testimony involving this defendant is far from satisfying. If we accept the statement of counsel for the government to the effect that "the jury could have acquitted him without being inconsistent with the record" as accurately reflecting the state of the record, then this defendant was entitled to an acquittal. As to him the evidence is circumstantial and the circumstances relied on must not only be consistent with his guilt, but must be inconsistent with every other reasonable hypothesis. If, as conceded by counsel for the government, the jury might have acquitted him without being inconsistent with this record, then the circumstances proved are not inconsistent with the theory of his innocence, and his guilt has not been proven by substantial evidence beyond a reasonable doubt. The lower court should have granted his motion for a directed verdict.

5. Many assignments relate to the rulings of the court on the admissibility of evidence, but we think only two of these matters are worthy of consideration. There was offered in evidence a carbon copy of a purported letter from Cochran to Lorenz and a like carbon copy of a purported answer to this letter from Lorenz to Cochran. The originals were, of course, not in possession of the government. The foundation for the introduction of the carbon copies was laid by proving that they were carbon copies of letters that had been sent, and there was proof that Cochran had dictated the letter from himself to Lorenz. While there was some uncertainty as to the testimony of the stenographer, who was a hostile witness, the matter was cleared up by Cochran's own testimony, which clearly shows that he not only knew about the sending of this letter, but that he in fact authorized, if indeed, he did not dictate it in its entirety. The letter from Lorenz showed on its face that it was an answer to the letter from Cochran. These letters passing between two of the defendants, referred to the scheme to defraud and were in furtherance of it. They were certainly admissible as against Cochran, and, being in furtherance of the scheme to defraud, were admissible against all the defendants who were connected with the scheme at that time. The effect of the letters was carefully guarded by the instructions of the court, particularly as they might affect Nelson, but if the testimony was admissible, the mere fact that it may have been prejudicial is not a ground for reversal, and we are of the view that there was no error in admitting them.

There was offered in evidence an exhibit referred to as the Deringer statement, and it is urged that its admission was reversible error. Deringer, the author of this statement, was one of the defendants. It was, therefore, certainly admissible as to him, and the government's proof was to the effect that it had either been read to or handed to the defendant Nelson. The effect of the statement was carefully limited by the court's instructions, and the jury were told that it was competent only for such bearing as it might have on the question as to whether Deringer knew of the alleged scheme when he went into it, and as to whether Nelson knew of the scheme. It was certainly competent for these purposes.

6. The alleged misconduct of counsel for the government is made a storm center of attack. An examination of the record convinces that this storm is in the nature of a "tempest in a teapot." The incident which is most emphasized, occurred in the examination by the District Attorney of a government witness. The witness appeared to be reluctant, if indeed, not hostile. The record shows that her answers were evasive to such an extent that the court asked her at least one or two questions in an attempt to elicit a direct answer from her to the question propounded. Confronted with this situation, the government's attorney stated that he wished to lay a foundation for perjury. This remark was objected to and the court at once sustained the objection, holding the remark to be unwarranted. The court at once instructed the jury to disregard the remark and not to be influenced or prejudiced by the zeal or attitude of counsel. Without deciding whether the action of government's counsel constituted misconduct of counsel, it appears that the court so held and in effect reprimanded counsel and warned the jury. It must be remembered that the witness was not

a witness produced by the defendant, but was the government's own witness. It cannot be presumed under these circumstances, that any prejudice resulted to the defendants. Carroll v. United States (C. C. A.) 154 F. 425; Hopt v. Utah, 120 U. S. 430, 7 S. Ct. 614, 30 L. Ed. 708; Dunlop v. United States, 165 U. S. 486, 17 S. Ct. 375, 41 L. Ed. 799; Diggs v. United States (C. C. A.) 220 F. 545.

7. During the trial and without the knowledge of the court or counsel for either side, certain of the jurors viewed some of the properties involved in this controversy. It appears from the record that during the course of the trial, the defendant Cochran had suggested to the court that it might be beneficial to the jury in applying the testimony, if they could see these properties. Counsel for all the defendants were then present and such as expressed themselves at all, expressed a willingness to have this done. The matter was not determined by the court, however, and the view which certain of the jurors took was not pursuant to direction of the court, nor with the knowledge of counsel. This was not a part of the trial, and, in the absence of a showing of prejudice, is not ground for reversal. Valdez v. United States, 244 U. S. 432, 37 S. Ct. 725, 61 L. Ed. 1242. The matter was not brought to the attention of the court during the trial but was presented on motions for a new trial. It was addressed to the judicial discretion of the trial court, and in the exercise of such discretion the motions were denied. The ruling of the trial court on the motion for new trial is not reviewable on appeal. Ng Sing v. United States (C. C. A.) 8 F.(2d) 919, 922; Smith v. United States (C. C. A.) 231 F. 25; Rossi v. United States (C. C. A.) 278 F. 349. In Ng Sing v. United States, supra, it is said, with reference to a motion of this sort: "The motion was heard on affidavits and on testimony taken in open court, and from a full consideration of all the testimony the court was convinced that the plaintiffs in error were in no wise prejudiced by the incident complained of. The motion for a new trial was addressed to the sound discretion of the court, and no abuse of discretion is shown."

8. It is contended by defendants that dismissal of the indictment as to the conspiracy count amounted to a dismissal as to the entire indictment, on the theory that there was a merger of the first twenty-two counts in the twenty-third count. It should be observed that the dismissal as to this count was not tantamount to an acquittal on that count. As said by the Supreme Court of the United States in Dealy v. United States, 152 U. S. 539, 14 S. Ct. 680, 681, 38 L. Ed. 545: "A nolle was entered as to several, but a nolle works no acquittal, and leaves the prosecution just as though no such count had ever been inserted in the indictment." In the dismissal of the conspiracy count, counsel for the government exercised a precaution for which he is to be commended, rather than criticized. The contention of counsel is untenable, and no possible prejudice can have resulted to the defendants.

9. It is strenuously urged that the sentences imposed in this case were so severe as to constitute cruel and inhuman punishment. They were, however, within the statutory limits, and hence, within the discretion of the trial court. As said by Mr. Justice Holmes in Badders v. United States, 240 U. S. 391, 36 S. Ct. 367, 368, 60 L. Ed. 706, "As to the other point, there is no doubt that the law may make each putting of a letter into the postoffice a separate offense. Ebeling v. Morgan, 237 U. S. 625, 35 S. Ct. 710, 59 L. Ed. 1159; Re Henry, 123 U. S. 372, 374, 8 S. Ct. 142, 31 L. Ed. 174, 175. And there is no ground for declaring the punishment unconstitutional." As succinctly said by this court in an opinion by Judge Stone in Lonergan v. United States (C. C. A.) 287 F. 538, 539: "It is, also, objected that the sentence was excessive and 'not in keeping with the character or gravity of the offense or the degree of moral turpitude involved in the alleged crime.' We cannot consider such a matter, the amount of punishment being a matter exclusively within the judgment of the trial court." See, also, Ebeling v. Morgan, 237 U. S. 625, 35 S. Ct. 710, 59 L. Ed. 1151; Ex parte Henry, 123 U. S. 372, 8 S. Ct. 142, 31 L. Ed. 174; Ex parte De Bara, 179 U. S. 316, 21 S. Ct. 110, 45 L. Ed. 207; Hodgskin v. United States (C. C. A.) 279 F. 85.

10. It is not possible to review all the extravagant multiplication of assignments of error appearing in this record. There are many assignments in the record with reference to the admissibility of evidence. We have examined them and find that many of them are trivial and are convinced that no prejudicial error was committed in these rulings. If error at all, they come within the category of harmless errors, within section 269 of the Judicial Code (28 USCA § 391), which do not affect the substantial rights of the defendants and are not grounds for reversal.

It follows that the judgments should be and are sustained as to all the defendants,

with the exception of the defendant Richard O. Naegele, and as to him the judgment is reversed, with directions to the lower court to grant him a new trial.