**UNITED STATES of America**

v.

**Joseph R. JACKSON, Appellant.**

**No. 78–1768.**

United States Court of Appeals, District of Columbia Circuit.

Argued Feb. 26, 1979.

Decided Jan. 29, 1980.

As Amended Feb. 8, 1980.

Stuart Stiller, Washington, D. C. (appointed by this Court), for appellant.

Jerry D. Bernstein, Asst. U. S. Atty., Washington, D. C., with whom Earl J. Silbert, U. S. Atty., John A. Terry, Peter E.

George and C. Madison Brewer, Asst. U. S. Attys., Washington, D. C., were on brief, for appellee.

Before MacKINNON and ROBB, Circuit Judges, and RICHEY,* United States District Judge for the District of Columbia.

Opinion for the Court filed by Circuit Judge MacKINNON.

MacKINNON, Circuit Judge:

On May 19, 1978, following a separate trial, a jury found Joseph R. Jackson guilty of conspiracy with others to distribute and to possess heroin with intent to distribute,[1] and of one count of distribution of heroin.[2] On July 7, 1978, the district court imposed sentences of five to fifteen years on the conspiracy count and one to five years on the distribution count, with a special parole term of three years on each count. The sentences were to run consecutively.

On this appeal Jackson contends (1) that the district court was biased against him and deprived him of a fair trial; (2) that the district court erred in ruling that his prior manslaughter conviction was admissible as probative of Jackson's credibility if he took the stand; (3) that the district court erred in refusing to suppress a non-verbal admission allegedly obtained in violation of Jackson's fifth amendment rights against self-discrimination and to due process; (4) that whereas the indictment charged one overall conspiracy, the proof adduced at trial demonstrated two separate conspiracies of which Jackson only was party to one, resulting in a variance substantially affecting his right to a fair trial; and (5) that the district court erred in permitting the admis-

---

* Sitting by designation pursuant to 28 U.S.C. § 292(a).

1. The conspiracy count was brought under 21 U.S.C. § 846 (1976), which provides that "[a]ny person who attempts or conspires to commit any offense defined in this subchapter" is punishable by imprisonment or fine up to the maximum for the substantive offense the commission of which was the object of the attempt or conspiracy. The substantive offense is defined in the same subchapter in *id.* § 841(a). *See* note 2 *infra*.

2. 21 U.S.C. § 841(a) (1976) provides:

> Unlawful acts
> Except as authorized by this subchapter, it shall be unlawful for any person knowingly or intentionally—
> (1) to manufacture, distribute, or dispense, or possess with intent to manufacture, distribute, or dispense, a controlled substance;

Heroin is a Schedule I controlled substance. *Id.* § 812(c).

sion of hearsay declarations without making a preliminary determination solely based on independent evidence that Jackson and others did indeed form an unlawful conspiracy.

We find the support for these allegations of error to be unconvincing and affirm the judgment of the district court.

# I

## FACTS

In an indictment returned on November 1, 1977, the Government charged in the First Count that from on or about June 24, 1977 to on or about August 16, 1977, Jackson, together with Irvin Hall, Norman Fitzgerald, Gregory Crosby, and Cecelia Bethea, conspired to distribute heroin and to possess it with intent to distribute. In the Third Count the Government charged Jackson, Crosby, and Bethea with unlawful distribution of heroin on August 16, 1977.

Fitzgerald and Bethea later entered guilty pleas to subsequently drafted informations charging violations of the Uniform Narcotics Act.[3] Crosby entered a guilty plea to the conspiracy charged in the First Count. On February 9, 1978, the district court granted the Government's motion and severed Jackson's trial from Hall's.[4] Hall's trial commenced the same day as this ruling, and the jury found him not guilty of conspiracy.[5]

Jackson's trial began on May 15, 1978.

## A. The Trial

The Government's evidence showed that in June 1977, agents of the joint Metropolitan Police-Drug Enforcement Administration (DEA) Task Force, under a promise of immunity, induced Catherine Holmes to aid them in an investigation of narcotics dealing in Washington, D. C. Holmes had once been Hall's paramour, and she agreed to try to purchase heroin from Hall under the Task Force's supervision. Tr. 107–109. Pursuant to this agreement, Holmes contacted Hall on June 24 to ask if he could arrange for her to purchase a "spoon" of heroin. Tr. 108. Hall told her that he could, and they spoke several times during the next two days to confirm arrangements.[6] On June 27, acting on Hall's instructions, Holmes went to Hall's apartment at 101 G Street in Southwest Washington and gave Hall $300 in exchange for a package purporting to be a spoon of heroin. Holmes turned the package over to the Task Force agents. A DEA chemist later determined that the package weighed 2.365 grams and consisted of 1.8% heroin. Tr. 94.

Three days later Holmes called Hall at Happy's Liquor Store. Jackson was the manager of Happy's, and Hall and Fitzgerald worked for him there.[7] Holmes complained to Hall about the quality of the heroin she had purchased. Hall told her that "I gave you the same goods the guy gave me." Tr. 115. Holmes then told Hall that she had a buyer with the money to

---

**3.** 33 D.C.Code § 402(a); 22 D.C.Code § 105.

**4.** The late District Judge Waddy made this ruling and presided at Hall's trial. Jackson was scheduled to be tried with Hall, but apparently was a fugitive on the date the trial was to start. Judge Waddy issued a bench warrant for Jackson's arrest on February 8, which was executed on February 27. Subsequently, Judge Waddy fell ill, and District Judge Hart presided at Jackson's trial in his stead.

**5.** In the original indictment which charged both Jackson and Hall with conspiracy, Hall was separately charged with one count of distribution of heroin in violation of 21 U.S.C. § 841(a). He was acquitted of this count also.

**6.** These telephone calls, like the other calls to which the Government's testimony referred,

were recorded by Task Force agents. The tapes of these calls were played during the presentation of the Government's case-in-chief.

**7.** The record is not clear concerning Jackson's relationship to Happy's. At the suppression hearing, in response to a question from the bench, the prosecutor stated, without contradiction from Jackson's counsel, that Jackson "ran" the liquor store. Tr. 61. DEA Agent Davis testified that Crosby told him that he (Crosby) was part-owner of Happy's, "the store that Mr. Jackson had an interest in." Tr. 300. We assume for the record that Jackson held a managerial position at the store, but this assumption does not prominently figure in our analysis of Jackson's allegations of error.

purchase a half kilo and that he should talk to his supplier about setting up a deal. Tr. 115.

On July 26, Holmes called Hall at Happy's to say that her friend "Jerry Ingram" was in town with $56,000 looking for some good heroin. Tr. 117–118. "Ingram" was the undercover name being used by Metropolitan Police Officer Anthony Patterson. The next day, Hall told Holmes that he could obtain the heroin for Holmes. Tr. 122. They discussed quantity and price. Hall told Holmes to meet him at Happy's later that evening. Holmes went to Happy's as directed and there she met with Hall and Jackson.[8] Hall told Holmes that the drugs belonged to Jackson. Tr. 130. Jackson told Holmes that she would have to put some money "up front" if the deal was to go through. Tr. 126–127.

The next day Holmes brought $6000 to Happy's and gave the money to Hall, who put it in a safe. Tr. 133. After checking with Patterson on her instructions, Holmes rode with Jackson to a house in Northwest Washington, where Jackson spoke with a man who Jackson identified as Bob Wayne, the person who would supply the heroin. Jackson and Holmes then returned to Happy's and were followed in a camper truck by an unidentified third person. Tr. 138.[9] Once back at Happy's, Jackson directed Hall to count out $4,910 of the money Holmes had brought and give it to the unidentified third person. Hall did so and the man left in the camper truck.[10]

Jackson promised Holmes that they would pick up the heroin later in the day.

As Holmes waited at Happy's, both she and Jackson spoke with Patterson. During one of these conversations Patterson asked Jackson whether he should continue to deal with Hall. Jackson responded that "I am the one he [Hall] gets it from." Tr. 143. No deal occurred that day.

Over the course of the next two weeks Patterson spoke to Jackson and to Fitzgerald, who was acting for Jackson, on numerous occasions about the arrangements for the heroin sale. In early August, Patterson received a call from Gregory Crosby, who said he was calling at Jackson's request to arrange for a deal. Tr. 210. Crosby later testified for the Government that Jackson had given him Patterson's telephone number and had asked him to arrange a deal with Patterson. Tr. 281–285. Several meetings between Patterson, another Task Force undercover agent Morris Davis, and Crosby, ensued. Crosby told Patterson that the price of the heroin he would obtain would be reduced by the $5000 Jackson had already received from Patterson. Tr. 217–218. Patterson spoke to Jackson during this time, and Jackson assured Patterson that Crosby was "his [Jackson's] man." Tr. 218.[11]

On August 15, Patterson and Crosby went to Baltimore to consummate the heroin deal. The next day, while returning to Washington, D. C. in Crosby's car with Crosby and his confederate Cecelia Bethea, Patterson was given a small package purporting to be a sample of the half kilo of heroin to come. Tr. 244. A DEA chemist later determined that the package weighed .979 grams of which 6.4% was her-

---

8. Chronologically, this is the first direct and explicit reference to Jackson in the Government's case-in-chief, a fact that serves as the basis for Jackson's variance argument on appeal. *See text accompanying note 29 infra.*

9. The Task Force had the principals under constant surveillance during this time period and many of these comings-and-goings were observed and photographed by Task Force agents. *See, e. g.,* Tr. 271–274 (testimony of DEA Agent Grimes); Tr. 437–438 (testimony of Police Detective Isaac); Tr. 432 (testimony of Police Detective Liebrand); Tr. 405–406 (testimony of Police Detective Vislay).

10. According to Holmes' testimony at trial, the remaining $1,090 was returned to her and she gave it back to the Task Force agents. Tr. 153–154.

11. Crosby testified that after one of his meetings with Patterson and Davis he wired some money to Chicago for the half kilo. He said he would have paid $24,000 to $25,000 for the heroin and that he would have given a portion of the remaining funds he would have received from Patterson to Jackson to pay Jackson for giving Crosby Patterson's number. Tr. 287–288.

oin. Tr. 98. Crosby and Bethea were arrested shortly after they arrived in Washington. A warrant for Jackson's arrest was issued the same day.

Jackson's only witness in defense was Fitzgerald. Fitzgerald testified that Jackson had claimed to him that he (Jackson) had "a mark from out of town that he was going to trim." Tr. 469. Fitzgerald asserted that Jackson was attempting to "flim flam" Patterson out of the $4,910.[12]

### B. Pre-Trial Proceedings

In response to the arrest warrant Jackson surrendered himself at the office of Assistant United States Attorney Madison Brewer on August 22. The record is unclear, but it appears that Jackson did not have an attorney with him when he arrived at Brewer's office.[13] According to the testimony at the pretrial suppression hearing by Task Force Agent John King, who was present in Brewer's office when Jackson arrived, Jackson was advised of his rights as soon as he entered the office. Tr. 46, 52. Jackson was asked if he understood his rights; he had no questions with regard to them. There is no indication in the record that Jackson expressly waived his rights by any written document.

According to Agent King's testimony, Brewer and Jackson made an arrangement with respect to Jackson's release while Jackson was still in Brewer's office. Sometime after leaving Brewer's office, Jackson was brought before United States Magistrate Jean Dwyer. He had an attorney with him at this point. At the presentment, Brewer reported that Jackson "contacted me this morning and we arranged the following proceedings." Tr. Supp. 2. "Pursuant to this agreement with Mr. Jackson," Brewer explained, "the Government will not oppose putting him on release at this time," subject to "one condition that we've agreed upon." *Id.* The condition, Brewer said, was that Jackson would "return to the Government certain property. He has 24 hours in which to do that, to wit, it's $4,910.00." *Id.* Jackson was released.

One week later, on August 29, Jackson appeared at the office adjacent to Brewer's office where he was met by Task Force agents William Vislay and Michael Grimes. Jackson came alone. At the suppression hearing, Vislay testified:

I told Jackson, I said we did not want you to make any statements. I said your lawyer is not here, I said you are here by yourself, I said we don't want you to make any statements, as a matter of fact,

---

**12.** On cross-examination Fitzgerald denied that he did not testify for the Government out of fear of Jackson. Tr. 478. He also claimed that he had told the Task Force agents after his arrest that Jackson's activities were "a plot to trim the mark." Tr. 479. In rebuttal, Task Force Agent King testified in contradiction that Fitzgerald had told King both after his arrest and before the start of the trial that he would not cooperate with the Government out of fear of Jackson. King also denied that Fitzgerald had ever characterized Jackson's actions as a "flim-flam" scheme. Tr. 495–498.

**13.** In its brief the Government unqualifiedly states that Jackson's return of the $4,910 "was arranged by [Jackson] through his counsel during the negotiations with the prosecutor prior to presentment," and that at the presentment "the prosecutor advised the court that [Jackson]'s counsel and the Government had entered into an agreement" for the return of the money. Br. for the United States at 30. These statements may be true, but there is no direct testimony in the record to support them. The portions of the record to which the Government cites only indicate that the prosecutor advised the court that Jackson and the Government made an arrangement. Tr. Supp. 2–3. Confronted with this at oral argument, Government counsel retreated, suggesting that it could be "fairly inferred" that an attorney was present when Jackson made the deal. This inference is supposed to arise from the fact that Jackson had an attorney at the presentment. Yet at the presentment the prosecutor told the court that Jackson "will retain counsel" and that "Mr. Black [Jackson's lawyer at the presentment] has now been appointed *for this appearance.*" (Tr. Supp. at 3 (emphasis added). Thus the Government's inference is not supported by the unconditional statements in its brief. It is not unreasonable to infer from this record that Mr. Black was appointed before the presentment but after Jackson's meeting with Brewer. We assume for our purposes that Jackson did not have an attorney when he made the arrangement with Brewer; as noted, the record makes clear that Jackson did have an attorney at the presentment where the arrangement was fully disclosed.

I said because anything you say will be used against you and *there will be a report of your turning in the money.* Tr. 27. (Emphasis added) Jackson gave Vislay $4,910.00 and Vislay gave Jackson a receipt therefor.

A hearing was held on Jackson's suppression motions on the morning of May 15, 1978. Before this hearing was held the Government announced its intention of introducing into evidence the fact that Jackson returned $4,910. After the hearing, Jackson's counsel argued that the nonverbal statement must be suppressed because the Government had failed to demonstrate compliance with the requirements of *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).[14] The district court found otherwise, ruling that "there were more than adequate *Miranda* warnings." Tr. 61–62. The statement was introduced into evidence during the Government's case-in-chief. Tr. 413–415.

Jackson's counsel offered three additional motions before the start of the trial. First, he moved that the trial judge recuse himself from presiding on the ground that the judge's participation in and comments on an earlier narcotics conspiracy case developed by the Task Force gave rise to an appearance of prejudice.[15] Second, he moved for a ruling by the district court that were Jackson to take the stand the Government could not impeach him by bringing out Jackson's prior conviction for manslaughter. Third, he asked the court to direct the Government not to mention any overt act involving Hall's sale of heroin to Holmes on June 27 until it first proved that Jackson was part of the conspiracy on that date. The district court denied each of the motions. At the close of the Government's case-in-chief, however, the district court ruled that there was insufficient evidence with which a jury could find that Jackson was involved in the June 27 sale, and it accordingly directed the jury to disregard the evidence pertaining to that sale.

## II

## JUDICIAL BIAS

Invoking the principle that a trial judge must remain a "disinterested and objective participant in the proceeding," *Billeci v. United States,* 87 U.S.App.D.C. 274, 283, 184 F.2d 394, 403 (D.C. Cir. 1950), Jackson contends that the district court exhibited a bias against him that wrongfully indicated to the jury its impression of Jackson's guilt and otherwise deprived him of an impartial tribunal.

■ Jackson premises his claim of prejudice before the jury on allegations that the district court improperly limited and interrupted the cross-examination of three Government witnesses by Jackson's trial counsel. Our examination of the record convinces us that this claim is a far-fetched characterization of events at the trial.[16]

The first allegedly improper limitation occurred during the cross-examination of Holmes. Holmes testified on direct examination about her past relationship with Hall and about her June 27th transaction with him. Holmes said that she told Hall she was buying for another person because Hall would not have believed that she was buying for herself. Tr. 111–112.

On cross-examination defense counsel attempted to impeach this statement by questioning Holmes about her use of drugs and familiarity with the vernacular of the nar-

---

**14.** When Jackson returned the money on August 29 he did make verbal statements to the Task Force agents about the money. He also made statements to the agents when he was rearrested pursuant to the indictment on November 1, 1977. The district court ruled these statements admissible, but the Government did not introduce them at trial.

**15.** In sentencing a defendant in an earlier trial the judge allegedly made some remarks that similar narcotics dealers should receive substantial sentences. *See* note 20 *infra.*

**16.** Jackson does not contend that these allegedly improper limitations and interruptions deprived him of his sixth amendment right to confrontation. Our independent review of the record discloses no basis for such a sixth amendment claim.

cotics trade. This line of inquiry was permitted and proceeded without interruption. Not until defense counsel began to pursue a wholly irrelevant line of questioning on the circumstances surrounding the death of Holmes' husband and the details of her sexual activities with Hall did the trial judge, prompted by the Government's objections, intervene and admonish defense counsel to stop.[17] Despite the court's clear admonitions, defense counsel persisted, leaving the court no choice but to rebuke him.[18]

Even had the line of inquiry been material to the issues before the jury, the trial court's treatment of the defense counsel would not suggest to the jury that it should find Jackson guilty. The court's conduct was well within the bounds of its prerogative to make rulings on evidentiary questions and cannot remotely be construed as signifying some predetermination of the factual issues in the case. That the court's intervention appears to have been totally proper in light of the inquiry defense counsel was pursuing only fortifies this conclusion.

The second and third instances of allegedly improper intervention do not even involve a limitation on the right of Jackson's counsel to pursue a line of inquiry. During the cross-examination of Patterson, defense counsel tried to elicit a "yes or no" answer on whether Patterson had attempted to link Jackson to Crosby in his conversations with the latter. The court permitted Patterson to explain his answer. Tr. 259–260. During the cross-examination of the DEA chemist, defense counsel asked whether .979 grams was a "small" amount. The court asked counsel to clarify his question, "small compared to what?" Tr. 99.

■ Not only did these comments from the bench not inhibit a line of questioning, but we are also at a loss to see how they might have signaled to the jury some judicial view of the merits. A trial judge is not required to sit mute in the courtroom and merely wield his gavel as moderator. We have consistently recognized the right of trial judges "to make proper inquiry of any witness when he deems that the end of justice may be served thereby and for the purpose of making the case clear to the jurors." *Griffin v. United States*, 83 U.S. App.D.C. 20, 21, 164 F.2d 903, 904 (D.C. Cir.), *cert. denied*, 333 U.S. 857, 68 S.Ct. 727, 92 L.Ed. 1137 (1948); *accord, United States v. Barbour*, 137 U.S.App.D.C. 116, 118, 420 F.2d 1319, 1321 (D.C.1969); *Roberts v. United States*, 109 U.S.App.D.C. 75, 76–77, 284 F.2d 209, 210–11 (D.C. Cir.), *cert. denied*, 368 U.S. 863, 82 S.Ct. 109, 7 L.Ed.2d 60 (1961).

The district court's actions during the cross-examination of Patterson and Crosby was a proper exercise of the right of trial judges to ask questions of witnesses and to demand clarifications of counsel. It matters little that no question was pending when the court permitted Patterson to explain his answer, for the court was entitled to ask the question itself *ab initio*, and

---

17. Jackson complains that the district court did not permit his counsel to proffer why the line of inquiry would be relevant. The questioning however was clearly irrelevant and the trial judge, who was present at the proceeding and familiar with the flow of the evidence, reached the same conclusion. And, significantly, Jackson tenders no reason here why, for example, the details of Holmes' sexual activity with Hall might be germane to the substance of her testimony or her credibility as a witness. Of course even if Jackson made such a proffer here and even if the line of inquiry were relevant, the trial court's rejection of the questioning was not accomplished by the kind of behavior associated with bias and prejudice.

18. Although the favored path is to make such rebukes out of hearing of the jury, that the court did not do so here provides no basis for finding that the jury was swayed by his comment that defense counsel was courting a contempt citation. The jury was aware that the defense counsel was disregarding the trial judge's admonition that his line of inquiry was irrelevant. That conclusion was easy to reach. In context the judge's remark was an expression of his disciplinary powers to maintain order in the court and to ensure adherence to his rulings, not of his views of the evidence. It can be helpful, at times, for the jury to be informed of the court's rulings. Judges also have some obligation to protect the respect due their position lest they lose their necessary stature with the jury.

without the limitation imposed on the question by defense counsel. The questioning of the DEA chemist called for a clarification lest the jury be left confused. It follows that merely by asking the question or demanding the clarification the judge did not represent any views of his to the jury. To this extent Jackson's claim is frivolous.

We have recognized that in the exceptional case in which overzealous and purposeful interrogation by the trial judge breaches the appearance of judicial even-handedness, reversal may be required. *United States v. Wyatt,* 143 U.S.App.D.C. 136, 442 F.2d 858 (D.C. Cir. 1971); *Jackson v. United States,* 117 U.S.App.D.C. 325, 329 F.2d 893 (D.C. Cir. 1964) (per curiam). Latent in aggressive questioning from the bench is the risk that the jury deliberations will be infected by undue deference to points raised by the judge, *United States v. Wyatt, supra,* 143 U.S.App.D.C. at 138, 442 F.2d at 860, or by what it perceives as a pro-Government tilt on the judge's part, *Jackson v. United States, supra,* 117 U.S. App.D.C. at 326, 329 F.2d at 894. The conduct condemned in *Wyatt* and *Jackson,* however, stands in vivid contrast to the district court's restrained, moderate, and useful handling of the witnesses in this case.[19]

Equally barren of merit are Jackson's efforts to portray certain pre-trial comments and rulings by the trial judge as well as his rulings on cross-examination as expressive of the trial judge's predisposition against him.[20] None of these comments or rulings indicate a personal bias against Jackson; each arose out of the trial judge's judicial responsibilities.[21] Individually and collectively the instances of ostensible bias Jackson cites demonstrate to us "nothing more than that the trial court ran a taut courtroom." *United States v. Green,* 139 U.S.App.D.C. 75, 80, 429 F.2d 754, 759 (D.C. Cir. 1970). That is not a basis even for a reprimand, let alone a ground of reversible error.

Indeed, the transcript of proceedings below is replete with instances of rulings favorable to the defendant.[22] To the extent that the trial judge's concern for orderly and proper procedure entered the record, his critical comments were by no means confined to the defense counsel's behavior. On various occasions during the trial the

---

**19.** In *Wyatt,* reversal was required by the trial judge's overbearing examination of the defendant's alibi witnesses, questioning which uncovered matters not previously subjected to inquiry by counsel and which was likely to mislead the jury. 143 U.S.App.D.C. at 137–139, 442 F.2d at 859–61. In *Jackson,* the court's "activist" and "lengthy" examination of witnesses elicited responses clearly adverse to the defendant. 117 U.S.App.D.C. at 326, 329 F.2d at 894.

**20.** Although he adverts to the basis for his pretrial recusal motion, we do not understand Jackson to contend that the trial judge abused his discretion in refusing to disqualify himself at the outset of the trial. His claim of bias on appeal relies on the trial judge's conduct of the trial. *See* note 21 *infra.* Nevertheless we note that nothing in the record indicates that the trial court was personally biased against Jackson before, during, or after the trial. A showing of prior judicial exposure to the *same* parties does not suffice to demonstrate personal bias. *United States v. Beneke,* 449 F.2d 1259, 1261 (8th Cir. 1971). It follows that a prior judicial exposure to the same type of case brought by the same law enforcement officers but involving different parties is an even less adequate basis to show personal bias. That the

trial judge made a comment about narcotics offenders generally is of no consequence. "A judge cannot be disqualified merely because he believes in upholding the law, even though he says so with vehemence." *Baskin v. Brown,* 174 F.2d 391, 394 (4th Cir. 1949).

**21.** Apart from the trial judge's rulings on cross-examination, Jackson claims the following indicates the trial court's "bias": its rulings on some Jencks Act materials, which he later reversed; its ruling that Jackson's prior manslaughter conviction was admissible, which we affirm; its denial, late in the trial, of a continuance so that Jackson's attorney could speak to a Government witness who had been on the Government's witness list from the beginning of the trial; its pre-trial comment that Jackson's attorney was to conduct voir dire "properly"; and his pre-trial comment that Jackson's attorney could spend the evening looking at some material rather than delay the trial.

**22.** The most prominent example is the trial court's ruling that the evidence linking Jackson to a conspiracy involving the June 27 sale was insufficient.

court berated the Government for delaying the trial or wasting time.[23] Each of these remarks was made in the presence of the jury; only one of the judge's comments cited by Jackson was within hearing of the jury.[24] We do not mean to suggest by this that a court's treatment of the defendant's counsel can always be offset by its equal treatment of the Government. We note it only to show that this judge was not one-sided in his occasional criticisms of counsel.

## III

### ADMISSIBILITY OF THE PRIOR CONVICTION

The Federal Rules of Evidence provide:

Rule 609(a) For the purpose of attacking the credibility of a witness, evidence that he has been convicted of a crime shall be admitted if elicited from him or established by public record during cross-examination but only if the crime (1) *was punishable by death or imprisonment in excess of one year under the law under which he was convicted, and the court determines that the probative value of admitting this evidence outweighs its prejudicial effect to the defendant,* or (2) involved dishonesty or false statement, regardless of the punishment.

(Emphasis added).[25]

■ There are two components to Jackson's contention that the district court improperly ruled his prior manslaughter conviction admissible for impeachment purposes. First, Jackson argues that the district court failed to take account of Rule

609(a)(1) in deciding that the prior conviction was admissible. This amounts to a claim that the district court did not meaningfully exercise its discretion within the confines of Rule 609(a)(1). Second and in the alternative, Jackson contends that the district court incorrectly determined that the probative value of the manslaughter conviction outweighed the prejudicial effect to be derived from its admission. This amounts to a claim that the district court abused its discretion within the confines of Rule 609(a)(1).

The record does not support Jackson's first contention. The discussion of whether the prior manslaughter conviction was admissible consumes five pages of the pre-trial transcript. The Government recited the circumstances in which it would admit the evidence, and explained the nature and date of Jackson's prior conviction. Jackson's counsel was permitted to point out at length the possible prejudicial impact to Jackson if the conviction was admitted. There were explicit and frequent references to Rule 609; the trial judge even distinguished the Rule from earlier cases in this circuit regarding the admissibility of prior convictions for impeachment.[26] At the close of the argument, the court ruled that it would allow the admission of the conviction, finding that "if [Jackson] takes the stand his credibility becomes highly pertinent." Tr. 68.

Although we have elsewhere expressed our preference for an explicit finding of admissibility phrased in terms of Rule 609(a),[27] we have not imposed this as an

---

23. *See* Tr. 3, 5, 176–177, 194, 269. One instance is when the trial judge threatened to dismiss the case for want of prosecution when the Government delayed calling a witness to the stand. Tr. 176–177.

24. The only instance of that happening was the trial judge's ruling on cross-examination of Holmes. *See* note 18 *infra.*

25. Jackson focuses on whether the conviction was admissible under Rule 609(a)(1), not (a)(2) and that is the only issue we address herein.

26. Defense counsel referred to our decisions in *Luck v. United States,* 121 U.S.App.D.C. 151, 348 F.2d 763 (D.C. Cir. 1965) and *Gordon v.*

United States, 127 U.S.App.D.C. 343, 383 F.2d 936 (D.C. Cir. 1967), *cert denied,* 390 U.S. 1029, 88 S.Ct. 1421, 20 L.Ed.2d 287 (1968), which governed consideration of the admissibility of prior convictions for credibility purposes before the adoption of Rule 609 in 1975. During the hearing on Jackson's request for a ruling on admissibility, the court correctly stated that the *Luck-Gordon* standard no longer controlled. Tr. 66.

27. *See United States v. Dorsey,* 192 U.S.App. D.C. 313, 326, 591 F.2d 922, 935, n. 14 (D.C. Cir. 1978); *United States v. Smith,* 179 U.S. App.D.C. 162, 171, 551 F.2d 348, 357, n. 17 (D.C. Cir. 1976); *accord, United States v. Ma-*

absolute requirement the nonperformance of which mandates reversal. We have no occasion to do so here where the applicable rule was referred to and the discussion included argument as to the prejudicial effect. The express terms of the Rule require the trial judge to make a determination that the probative value of the prior conviction outweighs its prejudicial effect. The record in this case indicates that the trial court was fully informed of the determination it had to make and of the facts and considerations relevant to that determination. That it did not specifically incant the litany of probative-value-versus-prejudicial-effect in its ruling that evidence of the prior conviction would be admissible does not constitute reversible error in the context of the consideration given the issue in this case. *See United States v. Seamster*, 568 F.2d 188, 189–91 (10th Cir. 1978); *United States v. Cohen*, 544 F.2d 781, 785 (5th Cir.), *cert. denied*, 431 U.S. 914, 97 S.Ct. 2175, 53 L.Ed.2d 224 (1977); *cf. U. S. v. Crawford*, 198 U.S.App.D.C. 312, 613 F.2d 1045 (D.C. Cir., 1979).

■ Also, Jackson's contention that the court erred in not delaying its ruling on the admissibility of the prior conviction until the close of the Government's case-in-chief is particularly unappealing. His own trial counsel asked the court *before* the start of the trial "for a ruling by the Court *now* as to the admissibility" of Jackson's manslaughter conviction. Tr. 64 (emphasis added). A pre-trial ruling, if possible, may generally be the better practice, for it permits counsel to make the necessary strategic determinations. Weinstein and Berger write:

> Generally the question of which convictions will be usable to attack credibility should be determined prior to trial. Counsel need to know what the ruling

will be on this important matter so that they can make appropriate tactical decisions. For example, the opening of defense counsel or the decision of the defendant to take the stand may be affected.

3 Weinstein & Berger *Evidence* ¶ 609[03a] at 609–79 (1978).

There may of course be other considerations such as a court's understandable desire to postpone ruling until he has a better opportunity to assess the evidence. Each case presents different problems. The district court here cannot be faulted for responding to the defense counsel's request for a pre-trial determination.

■ We cannot set aside the trial court's determination that Jackson's manslaughter conviction was admissible unless we decide that the district court abused its discretion in so ruling. Among the factors pertinent to an inquiry into whether the probative value of the prior conviction outweighs its prejudicial effects are the nature of the crime, the time of the conviction, the similarity of the past crime to the charged crime, the importance of the defendant's testimony, and the degree to which the defendant's credibility is central to the case. This list does not exhaust the range of possible factors, but it does outline the more basic concerns relevant to the balancing under Rule 609(a)(1).

Each of these factors was either expressly or impliedly brought to the trial court's attention during the pre-trial hearing on the admissibility of Jackson's prior conviction. Some of the considerations as applied to Jackson's conviction arguably weigh against admissibility. For example, the theory of Jackson's defense was that he took no part in a conspiracy to sell heroin but was merely trying to "flim flam" Patterson out of the money. His personal tes-

*hone*, 537 F.2d 922, 929 (7th Cir.), *cert. denied*, 429 U.S. 1025, 97 S.Ct. 646, 50 L.Ed.2d 627 (1976). It is noteworthy that in *Dorsey* and *Smith* remand was required because there was no indication in the record that the court, the Government, or the defense counsel even considered Rule 609; in *Mahone*, the court upheld the conviction, even while expressing a prefer-

ence for explicit findings, because the record made clear that the court had been aware of the relevant factors and considered them. Here we are confident the judge was aware of the Rule and the factors relevant to the Rule and made his decision on the basis of those factors.

timony, if believed, could have been important in demonstrating the validity of that defense.

Some of the considerations as applied to Jackson's prior conviction are arguably neutral on the question of admissibility. For example, though the fact that Jackson's earlier crime was one of violence may rank it comparatively low on the scale of veracity-related crimes and comparatively high on the scale of potential prejudice, the facts underlying the manslaughter conviction, which Jackson's attorney presumably could have brought out on redirect examination, tended to mitigate somewhat the "bad man" image its initial introduction might have engendered for the jury. The trial judge appeared to recognize as much.[28]

Finally some of the considerations as applied to Jackson's prior conviction tend to favor admissibility. For example, had Jackson chosen to take the stand his credibility would have been centrally in issue as it related to his "flim flam" defense. And, since there is no similarity between the past crime, manslaughter, and the charged crime, narcotics dealing, there would have been no danger that the jury would have perceived a pattern in Jackson's past activities and found him guilty of drug dealing because of his prior conviction for manslaughter.

In light of these considerations we are unable to conclude that the trial court's decision to admit evidence of Jackson's prior manslaughter conviction for impeachment amounted to an abuse of his discretion to make such determinations. Jackson's contention that the prior conviction was inadmissible solely because manslaughter is not particularly a veracity-related crime would have the trial court ignore the other pertinent factors and directly flies in the face of the congressional determination that such a crime, as a felony, may be admissible under Rule 609(a)(1).

**28.** During the discussion of Rule 609(a)(1) Jackson's trial counsel explained that Jackson's manslaughter conviction was the result of his shooting and killing his wife. Jackson had also shot the man who was with his wife at the

## IV

## ADMISSIBILITY OF JACKSON'S RETURN OF THE MONEY

Jackson asserts that the admission into evidence in the Government's case-in-chief of the circumstances of Jackson's return of $4,910 to the Task Force agents is reversible error. We disagree.

*Miranda* warnings are not required absent a custodial interrogation. *Beckwith v. United States*, 425 U.S. 341, 345–47, 96 S.Ct. 1612, 1615–16, 48 L.Ed.2d 1 (1976). Appellant contends that *Hensley v. Municipal Court*, 411 U.S. 345, 351–3, 93 S.Ct. 1571, 1574–75, 36 L.Ed.2d 294 (1973), and *cf. Morrissey v. Brewer*, 408 U.S. 471, 92 S.Ct. 2593, 33 L.Ed.2d 484 (1972) support his contention that he was "in custody" when he returned the money. *Hensley* holds that parole after conviction involves "conditional liberty" sufficient to constitute the "custody" required for *habeas corpus* jurisdiction. And in *Morrissey v. Brewer* the court took jurisdiction in a *habeas corpus* case involving a similarly situated petitioner. Thus, both of these cases were concerned with the wide scope of *habeas corpus* jurisdiction and not with the far narrower circumstances of "custodial interrogation" referred to in *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). *Miranda* holds inadmissible certain "statements . . . stemming from custodial interrogation . . .", 384 U.S., at 444, 86 S.Ct., at 1612, and defines that term:

"By custodial interrogation, we mean questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." 384 U.S. 444, 86 S.Ct. 1612.

This refers to physical custody which did not exist here since Jackson had been released on personal bond a week before and was free to move about on the day he

time. The defense counsel intimated that the conviction thus meant little. The trial judge asked "if it doesn't mean anything, why would it be prejudicial?" Tr. 67.

decided to return the money to the United States Attorney's office. He was not in custody or otherwise significantly deprived of his freedom when he made the statement which was admitted into evidence. Thus, the testimony that he returned $4,910 while he was free on personal recognizance is not a statement that stems from any custodial interrogation in the *Miranda* sense.

Moreover, as the trial court found and the evidence shows, Jackson was fully advised of his rights when he surrendered himself to the United States Attorney on August 22, one week before he returned the money. Jackson expressed his understanding of his rights and he did not ask questions about them. He was experienced with the criminal justice system. The record contains no sign that he did not or could not comprehend his rights or the consequences of his actions. On the day he returned the money, he was again advised not to make statements. He was also told that a report would be made of his return of the funds. Despite these warnings, Jackson nevertheless made verbal statements which the court ruled admissible but which were not in fact introduced.

Although we assume that Jackson did not have an attorney present when he surrendered himself to the United States Attorney's office and arranged to return the funds,[29] he did have an attorney at his presentment, where the arrangements were fully disclosed. His counsel there was aware of the details of the arrangement and presumptively aware of the potential consequences of Jackson's end of the bargain. The Government made no agreement not to introduce into evidence the fact that Jackson returned the money.

In the totality of the circumstances surrounding Jackson's return of the $4,910 we conclude that his action was the product of a voluntary and rational decision on his part. Jackson was not compelled to return the funds; indeed he was not compelled to admit that he had the funds in the first place. It was he who decided to turn himself in to the United States Attorney's of-

fice, and to do so alone. Before he entered into the bargain and while in custody he was fully informed of his rights to have an attorney present and to make no statements. He was told both at the time of his arrest and as he brought in the funds that any statement he made could be used against him. He was not in physical custody at the time he made the statement.

 A statement made in supposed return for a benefit is not automatically involuntary. Each case turns on an assessment of the peculiar circumstances of the case. For this reason Jackson's suggestion that our decision in *United States v. Powe*, 192 U.S.App.D.C. 224, 591 F.2d 833 (D.C. Cir. 1978), controls here is without merit. *Powe* involved strikingly different facts from those in the case at bar. Whereas in *Powe* the police conducted an interrogation within one half hour of the defendant's arrest, here Jackson made the admitted nonverbal statement one week after his arrest. Whereas in *Powe* the defendant was in custody at the police headquarters at the time the statement was made, here Jackson was free when he opted to make the statement. Whereas in *Powe* the defendant had never been previously arrested, here Jackson had a long history of involvement in criminal matters including prior court appearances. Whereas in *Powe* the defendant initially refused to talk to the police and did so only after being provoked by a police officer, here there is no indication that Jackson requested a lawyer or declined to speak to the agents and prosecutor either at the time of his initial arrest or at the time he made the statement.

It is noteworthy that the statement admitted against Jackson was *fully consistent* with the theory of his defense. Jackson's only witness, Fitzgerald, claimed that Jackson was merely trying to hoodwink Patterson out of the money. The evidence showed that the money was handled and controlled by Jackson. That he returned the money was not the central issue. The question instead was whether Jackson was

---

**29.** *See* note 13 *supra*.

attempting a swindle or whether he was carrying out his part in a conspiracy to distribute heroin. On all the facts the jury found the latter, and the evidence amply supports that verdict.

## V

## VARIANCE OF PROOF

Due process requires that a person be tried and convicted only for specific offenses with which he is charged. *Cole v. Arkansas*, 333 U.S. 196, 68 S.Ct. 514, 92 L.Ed. 644 (1948). A variance between the indictment and the proof adduced at trial which substantially affects the defendant's right to due process is reversible error. *Stirone v. United States*, 361 U.S. 212, 217, 80 S.Ct. 270, 273, 4 L.Ed.2d 252 (1960). Jackson maintains that while the indictment filed against him charged one overall conspiracy, the proof adduced at trial demonstrated two separate conspiracies, one involving Hall and the June 27 sale and the other involving Crosby and the August 16 sale, only one of which pertained to him. He claims that this variance substantially affected his due process rights and that his conviction must be reversed in consequence.

We are unpersuaded by this contention. Not only do we fail to see any variance between the indictment and the proof adduced at trial, but we find that Jackson has failed to show the requisite substantial prejudice that he alleges flowed from it. A variance alone is not fatal to a judgment of conviction. *United States v. Miley*, 513 F.2d 1191, 1207 (2d Cir. 1975). "The true inquiry . . . is not whether there has been a variance in proof, but whether there has been such a variance as to 'affect substantial rights' of the accused." *Berger v. United States*, 295 U.S. 78, 82, 55 S.Ct. 629, 630, 79 L.Ed. 1314 (1935).

It is not at all clear to us that the district court's ruling that there was insufficient evidence to link Jackson to Hall's sale on June 27 was required by the record. The evidence shows that Holmes contacted Hall on June 24 and consummated a transaction on June 27. Immediately following this transaction, Holmes contacted Hall at the liquor store managed by Jackson to arrange for another deal. She was told by Hall that Hall had obtained the heroin for the June 27 sale from another person. On July 26 and July 27 Holmes again contacted Hall at the same liquor store to make arrangements for the Patterson deal. Hall advised her on July 27 that the drugs belonged to Jackson. From this point on Jackson assumed control of the transaction, though Hall remained in a subordinate role. Jackson himself later told Patterson that Hall got the heroin from Jackson. This testimony would provide a basis on which the jury could have found that Hall operated as Jackson's agent, and that the June 27 sale was merely a prelude to the negotiations and transaction that ensued.[30]

Despite this evidence of Jackson's complicity during the period between June 24 and July 26, the district court ruled that the Government failed to produce sufficient evidence to establish a connection between Hall's activities before July 26 and Jackson. Immediately following this ruling and again in his final instructions, the court directed the jury to disregard the testimony concerning the June 27 sale. It told the jury not to consider "in any way, shape or form" the first five overt acts in the indictment and ordered the indictment redrawn. Tr. 463–464. Jackson had never been charged with a substantive offense relating to the June 27 sale, and the deletion of the June 27 sale from the indictment did not essentially affect the essential elements of the conspiracy charge as set forth in Count One.

---

30. It is clear that a party who knowingly joins an unlawful conspiracy may be held responsible for acts done in furtherance of the conspiracy both prior to and subsequent to his joining. *United States v. Bridgeman*, 173 U.S.App.D.C. 150, 158–159, 523 F.2d 1099, 1107–08 (D.C. Cir. 1975), *cert. denied*, 425 U.S. 961, 96 S.Ct. 1744, 48 L.Ed.2d 206 (1976); *United States v. Knight*, 416 F.2d 1181, 1184 (9th Cir. 1969).

■ What Jackson characterizes as a variance problem is nothing more than an instance where evidence is introduced and later struck by the court with directions that the jury disregard it during its deliberations. A variance problem by contrast typically arises when objectionable evidence that materially differs from the charge described in the indictment goes unimpeded to the jury and is considered during its deliberations. *See Kotteakos v. United States,* 328 U.S. 750, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946); *United States v. Bertolotti,* 529 F.2d 149 (2d Cir. 1975). The case at bar more closely represents a situation in which a court dismisses one count of an indictment following the close of the Government's case-in-chief, perhaps as an incident to a partial grant of a judgment of acquittal, and then the trial proceeds on the remaining counts. A directed verdict on some of the counts of an indictment in the middle of the trial does not give rise to a right to a new trial. *Schaeffer v. United States,* 362 U.S. 511, 80 S.Ct. 945, 4 L.Ed.2d 921 (1960).

■ In light of the trial judge's two cautionary instructions to the jury Jackson carries a heavy burden of showing substantial prejudice from the admission of the events between June 24 and July 26. A jury is presumed to follow a trial court's instructions. *Shotwell Manufacturing Co. v. United States,* 371 U.S. 341, 367, 83 S.Ct. 448, 463, 9 L.Ed.2d 357 (1963); *see United States v. Sanders,* 563 F.2d 379, 384 (8th Cir. 1977); *Leach v. United States,* 402 F.2d 268 (5th Cir. 1968), *cert. denied,* 392 U.S. 1082, 89 S.Ct. 864, 21 L.Ed.2d 775 (1969). This is particularly true when as here the trial judge's instructions were clear, concise, careful, and made only after consultation with the defendant's lawyer, and the evidence was amenable to easy segregation in the minds of the jury. *See United States v. Cruz,* 478 F.2d 408 (5th Cir. 1973); *United States v. Adams,* 434 F.2d 756 (2d Cir. 1970).

Jackson professes to find prejudice in the "spill over" effect of the conspiracy evidence on events antedating July 27. This argument derives from cases involving multiple defendants and numerous different conspiracies. *United States v. Corey,* 566 F.2d 429 (2d Cir. 1977); *United States v. Miley, supra.* The "spill over" risk may be very real when a minor participant in one conspiracy is forced to sit through weeks of damaging testimony relating to other conspiracies and other defendants. Here even if there were more than one conspiracy, which we do not find, Jackson was the only defendant on trial and the "two" conspiracies were easily distinguishable. *See United States v. Maselli,* 534 F.2d 1197 (6th Cir. 1976); *Baker v. United States,* 156 F.2d 386 (5th Cir.), *cert. denied,* 329 U.S. 763, 67 S.Ct. 123, 91 L.Ed. 657 (1946).

It is apparent that Jackson "could only have been benefitted by the deletion of [the] overt act[s] from the indictment." *United States v. Sir Kue Chin,* 534 F.2d 1032, 1036 (2d Cir. 1976). He has certainly shown no substantial prejudice.

## VI

## ADMISSION OF HEARSAY STATEMENTS OF CO–CONSPIRATORS

Appellant's final contention is that it was error for the court to admit, subject to connection, hearsay statements of a co-conspirator [31] relating to the June 27th sale, without making a *preliminary* determination of the existence of a conspiracy. Sometime after having admitted such testimony concerning the June 27th sale, subject to connection, the court ruled that there was insufficient evidence to connect that sale to Jackson and the conspiracy that was proven to exist after that date. The court's ruling took the form of instructing the jury as follows:

> "that declarations of one conspirator may be used against another conspirator, if the declaration was made during the course of and in furtherance of the conspiracy charged . . .." 417 U.S. at 218, 94 S.Ct. at 2259.

---

**31.** *Anderson v. U. S.,* 417 U.S. 211, 94 S.Ct. 2253, 41 L.Ed.2d 20 (1974), which was decided shortly before the Federal Rules of Evidence came into existence following their approval by the Supreme Court, restated the "well-recognized exception to the hearsay rule" . . . .

The Court will, therefore, strike the testimony with regard to that particular [June 27th] sale. You will not consider it in any way, shape or form, and I think rather than my talking about overt facts, page 2 of the indictment should be redrawn omitting overt acts 1 through 5, and starting out with 6, so numbered as 6.

Tr. 463–464.

Before the court so ruled and charged the jury, the government proffered that since it had not formally rested, "Mr. Hall will testify the drugs he sold on the 27th came from Mr. Jackson." Tr. 460. Hall had previously testified in his earlier trial before Judge Waddy on the same conspiracy that, "exhibit A [the drugs] came to him from Mr. Jackson and that it was all Mr. Jackson's doing." Tr. 462. The defense objected to such testimony on the ground that it would be admitted out of order—that to admit such testimony would constitute reopening the case.[32] However, the government had *not* formally rested. Nevertheless, the court, on such highly technical grounds, denied the motion to admit the testimony, saying, "you [the government] had plenty of notice there was a problem there and you didn't do it."

Against this factual background appellant asserts that error was committed because "a trial court must make a *preliminary* determination that the defendant in fact conspired", and in the absence of such preliminary determination, hearsay declarations of a co-conspirator are inadmissible. Appellant's precise contention is that the admission of evidence that co-conspirator Hall participated in the June 27th sale was prejudicial to him. The trial judge determined that there was not sufficient independent evidence to prove that the June 27th sale was made during the conspiracy

that was proven to exist thereafter, and struck from the record evidence of co-conspirator Hall's participation in the June 27th sale.

Appellant's contention is that in order to protect against the danger of prejudicing the defendant through exposing the jury to evidence they might otherwise not hear, district judges prior to admitting the hearsay statements of co-conspirators, should be *absolutely required* to make a *preliminary determination* that there is sufficient independent evidence of the existence of the conspiracy.

The law on this point is influenced in several particulars by the new Federal Rules of Evidence that became effective on July 1, 1975. Since that date a number of the circuits have ruled on the changes made in conspiracy trials by the new rules and while in some instances the courts resort to different terminology, generally they are not far apart in essential respects. As this case, and the contemporaneous opinion by Judge Robb in a case involving the same counsel, provide the first opportunity for this circuit to address some of the issues involved in proving a conspiracy since the new federal rules became effective, we will briefly review some of the underlying principles.

### A. Independent Evidence of the Conspiracy.

In 1942, *Glasser v. United States*, 315 U.S. 60, 74, 62 S.Ct. 457, 467, 86 L.Ed. 680 (1942), repeated the fundamental rule that declarations of a co-conspirator "are admissible over the objection of an alleged co-conspirator, who was not present when they were made, only if there is proof *aliunde* that he is connected with the conspiracy. (citations omitted) . . . Otherwise,

> We repeat the observation we made in an earlier case that the prosecutor should never withhold any relevant evidence from a criminal case-in-chief based on the expectancy that the defendant will testify and permit the introduction of the evidence in rebuttal. No defendant can be relied upon to take the stand; even if he does the testimony may prove to be improper in rebuttal.

---

**32.** *But see U. S. v. Larson*, 596 F.2d 759, 778–80 (8th Cir. 1979), in which the Eighth Circuit in a 2–1 decision in the Piper Kidnapping Case held that it was reversible error for the trial court to refuse to reopen *after* both parties had rested, but before oral argument, to permit the defense to offer relevant testimony that had just been discovered.

hearsay would lift itself by its own bootstraps to the level of competent evidence."

The reason for this long standing rule lies in the law of agency and partnership.[33] A statement in *U. S. v. Renda,* 56 F.2d 601, 602 (2d Cir. 1932), describing the basis for admitting declarations of others, is attributed to Judge Learned Hand:

> The declarations of one party to a concerted mutual venture are admitted against the rest on the notion that they are acts in its execution. (Citations omitted.) In so far as they are such, they are authorized by all, and are treated as their admissions. However, obviously the declaration cannot prove the authority any more than that of an agent. The party to be implicated must be shown independently to be in fact a party to the venture; else there is no authority to act for him.

*See U. S. v. Ziegler,* 583 F.2d 77, 80 (2d Cir. 1978).

More recently, in *U. S. v. Haldeman,* 181 U.S.App.D.C. 254, 341, 559 F.2d 31, 118 (D.C. Cir. 1976) (per curiam) (en banc), *cert. denied,* 431 U.S. 933, 97 S.Ct. 2641, 53 L.Ed.2d 250 (1977), which involved a trial held shortly before the Federal Rules of Evidence became effective, we had occasion to consider the manner in which a conspiracy must be proved.

> The correct formulation of this rule is that a particular defendant's connection with a conspiracy must be established by proof *aliunde*—that is, by proof other than the extra-judicial (hearsay) declarations of persons named or charged as co-conspirators or accomplices. Some preliminary determination must be made as to whether, if the testimony of Government witnesses is accepted as true, each defendant's own acts and statements show a connection with the conspiracy sufficient to justify the admission of the acts and statements of co-conspirators against him. The corollary to this rule is that, once the conspiracy has been established and a particular defendant linked to it by independent evidence, incriminating statements made by a co-conspirator during the pendency and in furtherance of the conspiracy are admissible against that defendant as an exception to the hearsay rule.

181 U.S.App.D.C. at 342, 559 F.2d at 119. The foregoing cases state general principles [34] but there are a number of subsidiary rules that need to be recognized.

---

**33.** *Hitchman, Coal & Coke Co. v. Mitchell,* 245 U.S. 229, 38 S.Ct. 65, 62 L.Ed. 260 (1917), and note 35 infra. *U. S. v. Renda,* 56 F.2d 601, 602 (2d Cir. 1932).

**34.** In *United States v. Martorano,* 561 F.2d 406 (1977), *cert. denied,* 435 U.S. 922, 98 S.Ct. 1484, 55 L.Ed.2d 515 (1978), the First Circuit in an opinion by (now) Chief Judge Coffin questioned the "continued vitality" of *Glasser v. United States,* 315 U.S. 60, 62 S.Ct. 457, 86 L.Ed. 680 (1942), to the extent that it required that proof of the conspiracy be completely independent of the proffered co-conspirator's statement. Three reasons were advanced for its suggestion that district judges be allowed to take into account the co-conspirator's statements as well as the independent evidence in deciding whether to admit the hearsay statements. 1) Federal Rule of Evidence 104(a) states that judges are "not bound by the rules of evidence except those with respect to privileges" 2) Trial judges, because of their legal training, will be cognizant of the inherent weakness of such evidence 3) even the bootstrapping feared by the Supreme Court in *Glasser* is allowable when the hearsay is reliable. F.R.Ev. 803(24).

The analysis advanced by the First Circuit suggests that:

> under any view of the law [the court] would . . . require significant independent evidence of the existence of the conspiracy, deviating from the *Glasser* practice only to the extent of permitting the district court to consider the independent evidence in the light of the color shed upon it by the highly trustworthy and reliable portions of the hearsay utterance seeking admission.

561 F.2d at 408. However, since *Martorano* provided ample evidence independent of the co-conspirator's statements by which the trial judge could make a preliminary determination of a conspiracy, *Glasser* was not challenged directly.

The suggestion in *Martorano* with respect to the independent evidence rule has been explicitly rejected by two other circuits, *United States v. Bell,* 573 F.2d 1040 (8th Cir. 1978), *United States v. James,* 590 F.2d 575 (5th Cir. 1979), *cert. denied,* 442 U.S. 917, 99 S.Ct. 2836, 61 L.Ed.2d 283 (1979), and implicitly by another, *United States v. McPartlin,* 595 F.2d 1321 (7th Cir. 1979). Several other circuits did not address the issue of Rule 104(a)'s effect on the

## B. *Evidence of the Conspiracy.*

■ What must be proved by independent evidence is merely that a *combination* existed between the third parties and the defendant. It is not necessary to show by such evidence that the combination was unlawful. That element may be shown by the hearsay declarations, *Hitchman Coal & Coke Co. v. Mitchell,* 245 U.S. 229, 38 S.Ct. 65, 62 L.Ed. 260 (1917),[35] and may be shown after proof of the existence of the combination.

■ The same rule also applies where a conspiracy is not charged in the indictment but two or more defendants were joint participators in the commission of substantive offenses. The Sixth Circuit opinion in *U. S.*

*v. Hoffa,* 349 F.2d 20, 41 (6th Cir. 1965), *aff'd on other grounds,* 385 U.S. 293, 87 S.Ct. 408, 17 L.Ed.2d 374 (1966), contains a recent expression of this application of the rule:

> Even though Congress has created a separate crime of conspiracy, it is settled that joint participators in the commission of the substantive offenses may be denominated as conspirators. *Kumpe v. United States,* 250 F.2d 125 (C.A.5, 1957). The conspiracy may be shown as an evidentiary fact to prove participation in the substantive crime. 16 Am.Jur.2d, Conspiracy, § 38, p. 147 (1964).

349 F.2d at 41. This rule is firmly established.[36] Experienced prosecutors alert court and counsel that they are relying on

---

independent evidence rule, but applied the independent evidence rule as previously stated. (2nd, 3rd, 4th, and 9th) As was the case with the *Martorano* court, it is not necessary to our decision to determine the effect of the Federal Rules on *Glasser.* Here, the trial judge did not attempt to submit the statements to the jury on the strength, even in part, of the co-conspirators' statements themselves; in fact, he found part of the independent evidence too weak to support the admission of co-conspirators' statements and struck the statements from the record.

**35.** *Hitchman Coal & Coke Co. v. Mitchell,* 245 U.S. 229, 249–50, 38 S.Ct. 65, 72, 62 L.Ed. 260 (1917) states: "In order that the declarations and conduct of third parties may be admissible in such a case, it is necessary to show by independent evidence that there was a combination between them and defendants, but it is not necessary to show by independent evidence that the combination was criminal or otherwise unlawful. The element of illegality may be shown by the declarations themselves. The rule of evidence is commonly applied in criminal cases, but is of general operation; indeed, it originated in the law of partnership. It depends upon the principle that when any number of persons associate themselves together in the prosecution of a common plan or enterprise, lawful or unlawful, from the very act of association there arises a kind of partnership, each member being constituted the agent of all, so that the act or declaration of one, in furtherance of the common object, is the act of all, and is admissible as primary and original evidence against them. (Cases cited) . . .

Upon a kindred principle, the declarations and conduct of an agent, within the scope and in the course of his agency, are admissible as original evidence against the principal, just as his own declarations or conduct would be admissible. (Cases cited.)"

**36.** 16 Am.Jur.2d 258, Conspiracy § 44 states the general rule:

> A conspiracy, though not charged as a crime, may be shown by the prosecution as an evidentiary fact to prove participation in a substantive crime.[13] The admissibility of evidence tending to prove the conspiracy of the defendant and others is not affected by the fact that the coconspirators of the defendant are not joined with him in an indictment charging the substantive offense.[14]

*See also* cases cited in footnotes 13 and 14. *Davis v. U. S.,* 12 F.2d 253, 257 (5th Cir.), *cert. denied,* 271 U.S. 688, 46 S.Ct. 639, 70 L.Ed. 1153 (1926), also contains a classic statement of the principle:

> Although conspiracy be not charged, if it be shown by the evidence to exist, the act of one or more defendants in furtherance of the common plan is in law the act of all. *United States v. Gooding,* 12 Wheat. 460, 6 L.Ed. 693; *Brown v. United States,* 150 U.S. 93, 14 S.Ct. 37, 37 L.Ed. 1010. In 2 Wigmore on Evidence, § 1079, will be found a selection of cases to the same effect. See, also, 1 Greenleaf (16th Ed.) § 184a; Underhill's Criminal Evidence, §§ 715, 718; 1 Bishop on Criminal Law (9th Ed.) §§ 629, 630; 2 Bishop's Criminal Procedure (2d Ed.) §§ 1248, 1249.

12 F.2d at 257. *Robinson v. U. S.,* 33 F.2d 238, 240 (9th Cir. 1929): "[A] scheme to defraud, when shared in by several, becomes a conspiracy, and, if a conspiracy exists in fact, the rules of evidence are the same as where a conspiracy is charged [citing cases]." *Cochran v. U. S.,* 41 F.2d 193, 199–200 (8th Cir. 1930), applies the same principle to mail fraud cases even where a conspiracy count was alleged and dropped. 41 F.2d at 199–200.

such procedures in cases where only substantive crimes are charged by announcing that they are proceeding on a conspiracy theory.

Another ramification of conspiracy trials is that "[p]articipation in a criminal conspiracy need not be proved by direct evidence; a common purpose and plan may be inferred from a 'development and a collocation of circumstances.'" *Glasser v. U. S.,* 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942). "The independent evidence establishing the existence of . . . a conspiracy may be direct evidence or circumstantial evidence." *U. S. v. Santos,* 385 F.2d 43, 44 (7th Cir. 1967), citing *U. S. v. Iacullo,* 226 F.2d 788 (7th Cir. 1955), *cert. denied,* 350 U.S. 966, 76 S.Ct. 435, 100 L.Ed. 839 (1956). The Court in *Glasser* also remarked: "the jury could infer the existence of a conspiracy and the participation of [the defendant] in it." 315 U.S. at 80, 62 S.Ct. at 469.

### C. *The Function of the Judge.*

In *Haldeman* we recognized that courts were split on whether the court or jury should make the preliminary determination concerning the existence of the combination and what the quantum of proof should be. On these issues we reserved decision. 181 U.S.App.D.C. at 341, 559 F.2d at 118, n. 247. However, since the trial in *Haldeman,* the Federal Rules of Evidence have become effective. Rule 104 now provides:

Rule 104. Preliminary Questions

(a) Questions of admissibility generally.—Preliminary questions concerning the qualification of a person to be a witness, the existence of a privilege, or the admissibility of evidence shall be determined by the *court,* subject to the provisions of subdivision (b). In making its determination it is not bound by the rules of evidence except those with respect to privileges.

(b) Relevancy conditioned on fact.— When the relevancy of evidence depends upon the fulfillment of a condition of fact, the court shall admit it upon, or subject to, the introduction of evidence sufficient to support a finding of the fulfillment of the condition.

(c) Hearing of jury.—Hearings on the admissibility of confessions shall in all cases be conducted out of the hearing of the jury. Hearings on other preliminary matters shall be so conducted when the interests of justice require or, when an accused is a witness, if he so requests.

F.R.Ev. 104. (Emphasis added)

█ This rule clearly requires that the judge alone shall determine the admissibility of the evidence. Shortly before the promulgation of the Federal Rules of Evidence, the Supreme Court in *U. S. v. Nixon,* 418 U.S. 683, 94 S.Ct. 3090, 41 L.Ed.2d 1039 (1974), stated that the issue is "to be decided by the trial judge." 418 U.S. at 701, n. 14, 94 S.Ct. at 3104, n. 14. All federal circuits that have ruled on this issue have reached the same conclusion, either in reliance on the Federal Rules of Evidence or by decisions prior to the adoption of such rules. *See, e. g., U. S. v. James,* 590 F.2d 575 (5th Cir. 1979) *(en banc), cert. denied,* 442 U.S. 917, 99 S.Ct. 2836, 61 L.Ed.2d 283 (1979), and cases cited therein at 580.

It has been suggested that a determination of whether to admit the hearsay declarations of co-conspirators involves a question of relevancy conditioned on fact, and under F.R.Ev. 104(b) is within the province of the jury. We believe that contention misreads Rule 104(b).

█ We are more persuaded that co-conspirators' hearsay statements may be admitted under Rule 104(b), "subject to [connection]" and that the original and eventual *admissibility* of such testimony shall be "determined by the Court", pursuant to the terms of Rule 104(a). Furthermore, we agree with the prudential considerations of the Fifth Circuit in *U. S. v. James, supra,* as it declined to "put[ ] the admissibility of coconspirator statements in the hands of the jury [because such a rule could not] avoid the danger that the jury might convict on the basis of these statements without first dealing with the admissibility question. . . . As a result, such statements should be evaluated by the

trained legal mind of the trial judge." 590 F.2d at 579. We therefore conclude that the judge shall rule on the admissibility of a co-conspirator's hearsay declarations, i. e., whether the conspiracy has been sufficiently proved or whether the evidence shall be admitted subject to connection.

### D. *The Order of Proof.*

■ As to the procedural timing of the determination by the trial judge, the better practice is for the court to determine *before* the hearsay evidence is admitted that the evidence independent of the hearsay testimony proves the existence of the conspiracy sufficiently to justify admission of the hearsay declarations.[37] However, many times witnesses are in possession of both hearsay testimony of co-conspirators and evidence that independently tends to prove the existence of the conspiracy. Given the myriad of difficulties that surround the availability of witnesses, it is just impractical in many cases for a court to comply strictly with the preferred order of proof by taking the testimony of such witnesses piecemeal, waiting until a conspiracy is fully proved by independent evidence, and then recalling from their normal pursuits, those who testify to hearsay declarations of co-conspirators.

As a concession to such practical impediments that arise during trial, the court is vested with considerable discretion to admit particular items of evidence "subject to connection." *U. S. v. Vaught,* 485 F.2d 320, 323 (4th Cir. 1973) ("[T]he judge may, in his discretion, permit the introduction of evidence as to things said and done by an alleged co-conspirator subject to being connected up and followed by evidence of the

existence of the conspiracy.") Citing: *Beckwith v. U. S.,* 367 F.2d 458 (10th Cir. 1966); *Briggs v. U. S.,* 176 F.2d 317 (10th Cir. 1949). *See United States v. James, supra,* at 582–83; *United States v. Bell, supra,* at 1044; *United States v. Geaney,* 417 F.2d 1116, 1120 (2d Cir. 1969), *cert. denied,* 397 U.S. 1028, 90 S.Ct. 1276, 25 L.Ed.2d 539 (1970).

■ Then, if at the close of the government's case, or at any other critical point, the necessary connection has not been proven, the court must upon motion, and may *sua sponte,* strike the testimony that has not been sufficiently connected and direct the jury to disregard it. *U. S. v. Geaney,* 417 F.2d 1116, 1120 (2d Cir. 1969), *cert. denied,* 397 U.S. 1028, 90 S.Ct. 1276, 25 L.Ed.2d 539 (1970); *U. S. v. Ziegler,* 583 F.2d 77, 80 (2d Cir. 1978); *U. S. v. Vaught, supra.* Only if this instruction cannot cure the prejudice threatened by the inadmissible hearsay is a mistrial required. *U. S. v. Geaney, supra,* at 1120.

■ Appellant Jackson would have this court go beyond specifying a preferred order of proof, to requiring that prior to the presentation of *any* hearsay evidence by co-conspirators the judge hold a "mini-trial" out of the presence of the jury to determine once and for all whether the government will present sufficient independent evidence of the conspiracy to the jury. Although we are sensitive to the possibility of prejudice arising from the introduction of hearsay evidence that the judge's later instruction to strike cannot divest of its prejudicial effect, the defendant may request, and should receive, mistrial in these circumstances. District judges should follow the

---

**37.** In *United States v. James,* 590 F.2d 575, 582, *cert. denied,* 442 U.S. 917, 99 S.Ct. 2836, 61 L.Ed.2d 283 (1979), the Fifth Circuit prescribed a "preferred order of proof", stating that:

> The district court should, whenever reasonably practicable, require the showing of a conspiracy and of the connection of the defendant with it before admitting declarations of a coconspirator. If it determines it is not reasonably practical to require the showing to be made before admitting the evidence, the court may admit the statement subject to being connected up.

*Cf. United States v. Macklin,* 573 F.2d 1046, 1049, n. 3 (8th Cir. 1978) ("[I]t is preferable whenever possible that the government's independent proof of the conspiracy be introduced first . . . ."); *United States v. Petrozziello,* 548 F.2d 20, 23, n. 3 (1st Cir. 1977) ("Although time-consuming, [the presentation of non-hearsay evidence first] avoids the danger that hearsay will be admitted in anticipation of a later showing of conspiracy that never materializes.")

preferred order of proof, where possible, and they have discretion to proceed as Jackson requests, but they have no obligation to do so.

### E. The Quantum of Proof.

Courts have expressed differently the rule concerning the quantity of evidence *aliunde* that must have been admitted by the end of the trial in order for the judge to allow hearsay statements of co-conspirators to remain in evidence. Part of the confusion derives from the fact that the end of the trial requires the judge to decide, not only whether there exists sufficient independent evidence to support the earlier admission of hearsay declarations received subject to connection, but also whether the combination of the independent evidence and the hearsay declarations constitute sufficient evidence to justify submitting the conspiracy count to the jury.

■ The end of testimony in a conspiracy trial where hearsay statements have been received subject to connection requires that two independent decisions be made by the court. First he must determine whether the prosecution has introduced sufficient independent evidence of the existence of the conspiracy and of defendant's participation therein that the hearsay statements of his co-conspirators may be admitted against the defendant as equivalent to his own admissions.

■ This initial judicial determination is made upon examination of the sufficiency of the facts tending to prove the existence of the agency relationship. The courts have applied various tests in describing the quantum of proof that is required to so prove the agency relationship, i. e., the conspiracy. Some courts rule that a "fair preponderance" of independent evidence is required

to establish the existence of the conspiracy. Others assert that its existence must be proved "more likely than not".[38] The Fifth Circuit holds that "[a]s a preliminary matter, there must be *substantial*, independent evidence of a conspiracy . . . ."[39] We choose to express our holding by ruling that the existence of the conspiracy must be proved by substantial independent evidence. The trial judge, as some have suggested, need not be persuaded of the existence of a conspiracy "beyond a reasonable doubt", because his assessment is one of fact in a determination of the admissibility of evidence, not of ultimate guilt. The determination of guilt is the responsibility of the jury. *United States v. Petrozziello*, 548 F.2d 20, 23 (1st Cir. 1977); *United States v. Bell*, 573 F.2d 1040 (8th Cir. 1978).

■ Also, we cannot agree with the Fifth Circuit that the evidence be "at least enough to take the question to the jury."[40] Such standard blurs what we consider to be two discrete determinations by the judge. After the judge has decided to admit the hearsay declarations of co-conspirators because he has found the existence of the conspiracy to have been proved by substantial independent evidence, the judge then makes the second determination, i. e., whether to submit the entire case to the jury. In this respect, he is guided by the standard enunciated by Judge Prettyman in *Curley v. United States*, 81 U.S.App.D.C. 389, 160 F.2d 229, 232 (D.C. Cir. 1947), *cert. denied*, 331 U.S. 837, 67 S.Ct. 1511, 91 L.Ed. 1850 (1947):

> whether upon the evidence, giving full play to the right of the jury to determine credibility, weigh the evidence, and draw justifiable inferences of fact, a reasonable mind might fairly conclude guilt beyond a reasonable doubt.

**38.** *See, e. g., United States v. Stanchich*, 550 F.2d 1294, 1298 (2nd Cir. 1977); *United States v. Petrozziello*, 548 F.2d 20, 23 (1st Cir. 1977); *United States v. Bell*, 573 F.2d 1040, 1044 (8th Cir. 1978).

**39.** *United States v. James*, 590 F.2d 575, 580–81 (5th Cir. 1979), *cert. denied*, 442 U.S. 917, 99 S.Ct. 2836, 61 L.Ed.2d 283 (1979), quoting *United States v. Nixon*, 418 U.S. 683, 701, n. 14, 94 S.Ct. 3090, 3104, 41 L.Ed.2d 1039 (1974).

**40.** Id., 581.

*Accord, United States v. Stanchich,* 550 F.2d 1294, 1299 (2nd Cir. 1977); [41] *U. S. v. Lumpkin,* 145 U.S.App.D.C. 162, 168, 448 F.2d 1085, 1091 (D.C. Cir. 1971) and cases cited therein.

The determinations involved in the two decisions differ in at least two respects. As the first determination demands only that existence of the conspiracy be proved by substantial independent evidence, proof would seem to be easier than that required to persuade the judge that a reasonable juror could be convinced of guilt beyond a reasonable doubt. On the other hand, in the second determination, the judge may consider hearsay declarations of co-conspirators, infusing potential "extra" evidence into the judge's determination of the reasonableness of concluding the guilt of the accused. Of course, the determination to be made by the jury is the stiffest: a belief in the guilt of the defendant, beyond a reasonable doubt, of the conspiracy count.

We conclude that if there is substantial independent evidence to support a conclusion that the conspiracy existed, the trial court is justified in allowing the admission of hearsay testimony of co-conspirators. Considering all the evidence concerning the conspiracy, both independent and hearsay, the court should then apply the standard stated in *Curley v. United States* to determine whether to submit the case to the jury.

### F. *The Testimony Regarding the June 27th Sale.*

Having stated these rules, we conclude that they were all complied with in this case, that the hearsay testimony was properly admitted, and that no reversible error occurred. We should explain, however, the basis for our decision that Jackson was not prejudiced by the admission of the evidence of the June 27th sale, which the trial court struck and charged the jury to completely disregard. Our explanation also refers to Overt Acts 1 through 5, which the Court ordered stricken from the indictment.

First of all we conclude that the judge's instructions were sufficient to repair any undue prejudice that might have been caused by the introduction of evidence relating to the June 27th sale. More importantly, however, our close review of the trial transcript and exhibits indicates that it would have been proper for the trial court to *refuse* to strike Overt Acts 1 through 5 and the evidence that it had admitted with respect to the June 27th sale. We find that there was substantial independent evidence in the record to support a conclusion that Jackson was involved in the conspiracy at the time of the June 27th sale.

We reach this conclusion after reviewing two telephone conversations that were recorded and admitted into evidence. In a recorded phone conversation on June 30, 1977, Hall stated to Holmes, when she complained of the quality of the drugs Hall had sold to her on the 27th, that, "there ain't nothing I can do but I gave it to you the same way the guy gave it to me." [Holmes] "Well, ah, did you tell me about the more you get the better it is? Or what?" [Hall] *"That's what the guy tells me.* You know." Later in the conversation, Hall stated: "So you know, when people call me once in a while and say they want something, *I just go to the guy and get it for them."* Gov't. Ex. 4, Tape D–1. (Emphasis added). This conversation indicates that Hall had obtained the drugs from some other person.

In a recorded telephone call on July 28, 1977 between "Joe" Jackson and Patterson (undercover agent), the following colloquy occurs:

Jackson: You'll be satisfied and just be patient. I guarantee you that I want to

**41.** The Second Circuit has long propounded the theory that two separate determinations, and two separate standards, are required of the judge in deciding the admissibility of hearsay evidence, and then whether the entire case can go to the jury. *United States v. Ross,* 321 F.2d 61, 68 (1963), *cert. denied,* 375 U.S. 894, 84 S.Ct. 170, 11 L.Ed.2d 123 (1963); *United States v. Ragland,* 375 F.2d 471, 477 (1967), *cert. denied,* 390 U.S. 925, 88 S.Ct. 860, 19 L.Ed.2d 987 (1968); *United States v. Geaney,* 417 F.2d 1116, 1119 (1969); *United States v. Stanchich,* 550 F.2d 1297, 1299 (1977).

 

*keep* your business. You know we do that pretty frequent.

Patterson: Yeah?

Jackson: Everything will be all right don't worry about it.

Patterson: Wait a minute. Now who'd I talk to?

Jackson: Joe. You talked to Irvin [Hall].

Patterson: Oh, OK.

Jackson: *I'm the one he gets it from.*

Patterson: OK.

Tr. 143, Gov't. Ex. 8, Tape K–6. (Emphasis added).

The plain inference from Jackson's assurance that "I want to *keep* your business", is that Jackson was the real party behind the June 27th sale as that was the only prior "business" between the two. Jackson's statement about "Irvin [Hall] *I'm* the one he gets it from", is an admission of his participation in the conspiracy and is supportive of Hall's statement that he got the drugs from some other person, i. e., "the guy gave it [the drugs] to me". Jackson's statement is admissible as direct, independent, if not conclusive, evidence of the existence of the conspiracy. And again, since the June 27th sale was the only prior transaction between the parties, Jackson's recorded statements effectively admit that he was the "guy" from whom Hall got the drugs for the June 27th sale.

On the basis of the evidence supplied by Jackson's statements, the trial judge could have concluded that there was substantial independent evidence that he was involved on June 27th in the conspiracy to sell heroin, and allowed the hearsay declarations of Hall to remain in evidence. Further, the judge could have concluded that the sum of evidence, independent and hearsay, could lead a reasonable juror to fairly conclude guilt beyond a reasonable doubt. Hence, the judge would have been justified in refusing to strike the testimony concerning the June 27th sale and in allowing the case to go to the jury. Therefore, Jackson was not in any way prejudiced by the admission of any of this evidence. In fact, he received more benefit than he was entitled to by the striking of the overt acts and of the testimony concerning the June 27th sale.

## CONCLUSION

Having reviewed the entire record and each of Jackson's claims of error we conclude that Jackson was a party to the conspiracy at the time of the June 27th sale and that the evidence of record fully supports the jury's finding that Jackson participated in the conspiracy after June 27th as charged in the indictment. We, therefore, find no basis for overturning his conviction and rule that the judgment of the district court be affirmed.

*Judgment accordingly.*